ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>HIRAM MORALES NEGRÓN<br><br>Apelante | KLAN202300876 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.:<br>J VI2021G0015 al 0018<br>J LA2021G0187 al 0193<br>J LE2021G0363 al 364<br><br>Sobre:<br>Art. 93 C.P.; Tent. Art. 93 C.P. (3 cargos), Arts. 6.14 (5 cargos), 6.09 y 6.22 L.A.; Arts. 2.8 y 3.2 Ley 54-1989 |
| --- | --- | --- |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y el Juez Campos Pérez[1]

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 17 de julio de 2025.

Comparece el apelante, el Sr. Hiram Morales Negrón, quien impugna las *Sentencias Enmendadas* emitidas en su contra el 7 de septiembre de 2023,[2] por el Tribunal de Primera Instancia, Sala de Ponce (TPI). Por virtud de los referidos pronunciamientos, el apelante fue condenado a cumplir 209 años de prisión, luego de que fuera juzgado por un Tribunal de Derecho y encontrado culpable mediante los respectivos fallos dictados el 19 de mayo de 2023.

**I.**

El 13 de agosto de 2021, el Ministerio Público presentó **13 denuncias** en contra del señor Morales Negrón,[3] por hechos criminales acontecidos el 12 de agosto de 2021, a las 4:00 de la tarde, en Villalba. Como resultado de los delitos imputados fue asesinado el hijo del apelante, Denny Amílcar Morales Torres.

---

[1] El Hon. José I. Campos Pérez sustituyó a la Jueza Santiago Calderón, por virtud de la Orden Administrativa TA-2023-212, emitida el 6 de diciembre de 2023.
[2] Los dictámenes fueron enmendados el 19 de septiembre de 2023, a los únicos fines de incluir el número de los casos en el texto.
[3] Véanse, 13 Tomos Autos Originales.

Número Identificador

SEN2025 _____

Mientras, sobrevivieron de sendas tentativas de asesinato Nélida Torres Maldonado, Xavier Armando Morales Torres y Juanita Maldonado Santiago —cónyuge, hijo menor y suegra, respectivamente, del compareciente—. El TPI encontró causa para arresto en todos los delitos y el apelante fue sumariado al no prestar una fianza global de $3,250,000.[4]

En lo que atañe al caso, surge de los autos que, el 30 de agosto de 2021, la Defensa solicitó una evaluación del apelante al amparo de la Regla 240 de Procedimiento Criminal, 34 LPRA Ap. II, R. 240, con el fin de determinar la capacidad mental y funcional del señor Morales Negrón.[5] El 6 de octubre de 2021, la psiquiatra del Estado, la Dra. Yamilka Rolón García (doctora Rolón García), compareció ante el TPI. Bajo juramento, indicó que evaluó al apelante, quien se mostró cooperador. La doctora Rolón García afirmó que no observó una conducta desorganizada ni psicótica aguda. Del mismo modo, aseveró que el señor Morales Negrón habló sobre los cargos en su contra, por lo que concluyó que el apelante era procesable.[6] Por igual, el 5 de octubre de 2022, la doctora Rolón García sostuvo su previa determinación de procesabilidad. Esta vez, hizo constar que el señor Morales Negrón tomaba una serie de medicamentos, los cuales debía continuar.[7]

Al respecto, la Defensa solicitó y el TPI emitió las órdenes para que se proveyeran los expedientes médicos, psiquiátricos y farmacológicos del apelante.[8] A tales efectos, el apelante invocó la defensa de incapacidad mental provista en la Regla 74 de Procedimiento Criminal, *infra*. El señor Morales Negrón contaría con

---

[4] Véase, Autos JVI2021G0015, págs. 4 y 8.
[5] Véase, Autos JVI2021G0015, págs. 66-67. El Ministerio Público replicó para invocar un turno de prioridad en el calendario. *Id.*, pág. 68.
[6] Véase, Autos JVI2021G0015, pág. 78.
[7] Véase, Autos JVI2021G0015, pág. 208.
[8] Véase, Autos JVI2021G0015, págs. 109-110; 113; 158-159; 165; 211-213; 223.

la pericia del Dr. Víctor Lladó Díaz.[9] Por su parte, el Ministerio Público contrató los servicios del Dr. Raúl López Menéndez.[10]

Celebrada la vista preliminar el 17 de diciembre de 2021,[11] el TPI autorizó al Ministerio Público a presentar las siguientes **13 acusaciones** contra el señor Morales Negrón:[12]

EL REFERIDO ACUSADO, HIRAM MORALES NEGRÓN, TAMBIÉN CONOCIDO POR CUBA, ALLÁ, EN O PARA EL DÍA 12 DE AGOSTO DE 2021, APROXIMADAMENTE A LAS 4:00 PM Y EN VILLALBA, PUERTO RICO, QUE FORMA PARTE DE LA JURISDICCIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE...

**JVI2021G0015**

... A PROPÓSITO Y CON CONOCIMIENTO DIO MUERTE AL SER HUMANO DENNY AMÍLCAR MORALES TORRES CONSISTENTE EN QUE UTILIZANDO UN ARMA DE FUEGO COLOR NEGRA LE HIZO VARIOS DISPAROS QUE LE OCASIONARON LA MUERTE.

**JVI2021G0016**

... ILEGAL, VOLUNTARIA, CRIMINAL, INTENCIONAL Y CON CONOCIMIENTO REALIZÓ ACTOS INEQUÍVOCA E INMEDIATAMENTE DIRIGIDOS A OCASIONAR LA MUERTE AL SER HUMANO JUANITA MALDONADO SANTIAGO, QUIEN ES SU SUEGRA, ACCIÓN QUE NO SE CONSUMÓ POR CIRCUNSTANCIAS AJENAS A LA VOLUNTAD DEL ACUSADO, CONSISTENTE EN QUE PENETRÓ EN LA RESIDENCIA DONDE ÉSTA SE ENCONTRABA, DISPARANDO UN ARMA DE FUEGO.

**JVI2021G0017**

... ILEGAL, VOLUNTARIA, CRIMINAL, INTENCIONAL Y CON CONOCIMIENTO REALIZÓ ACTOS INEQUÍVOCA E INMEDIATAMENTE DIRIGIDOS A OCASIONAR LA MUERTE AL SER HUMANO XAVIER ARMANDO MORALES TORRES, QUIEN ES SU HIJO, ACCIÓN QUE NO SE CONSUMÓ POR CIRCUNSTANCIAS AJENAS A LA VOLUNTAD DEL ACUSADO, CONSISTENTE EN QUE PENETRÓ EN LA RESIDENCIA DONDE ÉSTE SE ENCONTRABA, DISPARANDO UN ARMA DE FUEGO.

**JVI2021G0018**

... ILEGAL, VOLUNTARIA, CRIMINAL, INTENCIONAL Y CON CONOCIMIENTO REALIZÓ ACTOS INEQUÍVOCA E INMEDIATAMENTE DIRIGIDOS A OCASIONAR LA MUERTE AL SER HUMANO NÉLIDA TORRES MALDONADO, QUIEN ES SU CÓNYUGE, ACCIÓN QUE NO SE CONSUMÓ POR CIRCUNSTANCIAS AJENAS A LA VOLUNTAD DEL ACUSADO, CONSISTENTE EN QUE PENETRÓ EN LA RESIDENCIA DONDE ÉSTA SE

---

[9] Véase, Autos JVI2021G0015, págs. 141-142; además, págs. 160-161; 171.
[10] Véase, Autos JVI2021G0015, págs. 180-183.
[11] Véase, Autos JVI2021G0015, págs. 93-94.
[12] Véanse, 13 Tomos Autos Originales.

ENCONTRABA, DISPARANDO UN ARMA DE FUEGO OCASIONANDO UNA HERIDA DE BALA EN LA MANO.

**JLA2021G0187**

… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, APUNTÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU HIJO XAVIER ARMANDO MORALES TORRES, SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**JLA2021G0188**

… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, DISPARÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU HIJO XAVIER ARMANDO MORALES TORRES, SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**JLA2021G0189**

… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, DISPARÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU ESPOSA NÉLIDA TORRES MALDONADO, SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**JLA2021G0190**

… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, DISPARÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU HIJO DENNY AMÍLCAR MORALES TORRES, OCASIONÁNDOLE LA MUERTE, SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**JLA2021G0191**

… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, PORTÓ, POSEYÓ Y UTILIZÓ SIN AUTORIZACIÓN DE ESTA LEY UN ARMA DE FUEGO QUE PUEDE SER DISPARADA AUTOMÁTICAMENTE, LA CUAL ES CAPAZ DE CAUSAR GRAVE DAÑO CORPORAL, COMO EN EFECTO LO CAUSÓ, CONSISTENTE EN QUE PORTÓ UN ARMA DE FUEGO TIPO PISTOLA CAPAZ DE DISPARAR DE FORMA AUTOMÁTICA LA CUAL UTILIZÓ PARA DAR MUERTE A SU HIJO DENNY AMÍLCAR MORALES TORRES.

**JLA2021G0192**

… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, POSEYÓ MUNICIONES CALIBRE 40 DE ARMAS DE FUEGO SIN TENER NINGUNA LICENCIA AUTORIZADA POR LEY PARA POSEER LAS MISMAS.

**JLA2021G0193**

… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, DISPARÓ UN ARMA DE FUEGO

COLOR NEGRA HACIA SU SUEGRA JUANITA MALDONADO SANTIAGO, SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**JLE2021G0363**

… ILEGAL, VOLUNTARIA, A SABIENDAS Y CRIMINALMENTE VIOLÓ LO DISPUESTO EN LA ORDEN DE PROTECCIÓN NÚMERO OPA-2021-015088 DE LA LEY 54 EXPEDIDA POR LA HONORABLE JUEZA MARI NILDA APARICIO LASPINA A FAVOR DE LA SRA. NÉLIDA TORRES MALDONADO CON VIGENCIA DEL 10 DE AGOSTO DE 2021 AL 31 DE AGOSTO DE 2021 CONSISTENTE EN QUE SE PERSONÓ A LA RESIDENCIA DE LA PERJUDICADA CON EL CONOCIMIENTO DE QUE LE ESTABA PROHIBIDO.

**JLE2021G0364**

… ILEGAL, VOLUNTARIA Y CRIMINALMENTE EMPLEÓ FUERZA FÍSICA PARA CAUSAR DAÑO FÍSICO EN BIENES APRECIADOS POR LA SRA. NÉLIDA TORRES MALDONADO, QUIEN ES SU CÓNYUGE, CONSISTENTE EN QUE PENETRÓ EN LA MORADA DE LA PERJUDICADA, ROMPIÓ LA PUERTA DE CRISTAL DE ENTRADA Y ARRANCÓ LAS LAMAS DE LA VENTANA DEL CUARTO DORMITORIO PARA LOGRAR ACCESO AL INTERIOR DE LA RESIDENCIA.

La lectura de acusación se celebró el 23 de diciembre de 2021, ocasión en que el apelante solicitó el término reglamentario para registrar su alegación.[13] Posteriormente, a través de su representación legal, formuló una **alegación de no culpable**, por razón de la **defensa de incapacidad mental**.[14] Asimismo, el 20 de marzo de 2023, el señor Morales Negrón, asistido por la debida representación legal, **renunció al juicio por jurado**. El TPI examinó bajo juramento al apelante y determinó que la renuncia fue libre, voluntaria e inteligente, por lo que dispuso la continuación de los procedimientos por el Tribunal de Derecho.[15]

El **juicio en su fondo** se celebró del 28 al 30 de marzo de 2023; el 11, 13, 24, 27 de abril de 2023; el 18 y 19 de mayo de 2023. En éste, las partes ofrecieron y el TPI admitió la **evidencia estipulada** descrita a continuación:

---

[13] Véase, Autos JVI2021G0015, pág. 106.
[14] Véase, Autos JVI2021G0015, pág. 239. Transcripción de la Prueba Oral (TPO), pág. 4 líneas 13-14.
[15] Véase, Autos JVI2021G0015, págs. 234-236.

- **Exhibit 1:** Foto de una identificación del occiso

- **Exhibit 2:** Orden de Protección *Ex parte* OPA2021-015088 de 10 de agosto de 2021

- **Exhibit 3:** Informe Médico Forense, PAT-3401-21

- **Exhibit 4:** Documentos relacionados con la solicitud de servicios forenses y de la cadena de custodia

- **Exhibit 5:** Sobre embalado con proyectiles y sus derivados PAT 3401-21

- **Exhibit 6:** Identificación evidencia recibida de Patología Forense, PAT 3401-21

- **Exhibit 7:** 1 proyectil E-1

- **Exhibit 8:** Sobre embalado AF-21-1147

- **Exhibit 9:** Bolsa de estraza AF-21-1147

- **Exhibit 10:** Etiqueta embalada - disparo de prueba pieza 005

- **Exhibit 11:** 3 casquillos de bala (*full auto*)

- **Exhibit 12:** Etiqueta blanca, disparo de prueba pieza 005

- **Exhibit 13:** Proyectiles, casquillos y municiones (6 piezas)

- **Exhibit 14:** Etiqueta *label* – balas AF-21-1147 y bolsa plástica sellada

- **Exhibit 15:** 6 casquillos de bala

- **Exhibit 16:** Etiqueta *label* - casquillo de bala AF-21-1147 y bolsa plástica sellada

- **Exhibit 17:** 9 casquillos de bala E1 al E-9

- **Exhibit 18:** Etiqueta *label* AF-21-1147 y bolsa plástica sellada

- **Exhibit 19:** 3 plomos embalados E-1, E-2, E-4

- **Exhibit 20:** Fotografía de un proyectil recuperado en el occiso (PAT-3401-21)

- **Exhibits 21-33:** Fotografías del occiso (PAT-3401-21)

- **Exhibit 34:** Radiografía del occiso (PAT-3401-21)

Además, durante la vista en sus méritos, se ofreció y se admitió la siguiente **evidencia del Ministerio Público (MP)**:

- **Exhibit 1 MP:** Informe de Hallazgos de Escena de 1 de diciembre de 2021

- **Exhibit 2 MP:** Informe de Hallazgos de Escena de 16 de febrero de 2023

- **Exhibit 3 MP:** Arma de fuego color negra, serie BNTE-452, calibre .40

- **Exhibit 4 MP:** Abastecedor negro calibre .40 para 22 municiones

- **Exhibit 5 MP:** Abastecedor negro calibre .40 para 15 municiones
- **Exhibit 6 MP:** Abastecedor negro calibre .40 para 9 municiones
- **Exhibit 7 MP:** Certificado de Examen (Sección de Armas de Fuego y Marcas de Herramienta)
- **Exhibit 8 MP:** Cederrón de fotografías
- **Exhibits 9-54 MP:** Fotografías de la escena y el occiso

En apoyo a las acusaciones, el Ministerio Público presentó los siguientes testigos: el investigador forense Harry Natal Rivera, Agte. Kelvin Morales Negrón, Agte. Jimmy Hernández Pagán, Sgto. Clara Feliciano Rodríguez, la examinadora de armas Angélica M. Resto Rivera, el investigador forense Alberto Cruz Ramírez, el Sr. Efraín Enrique Meléndez Quiñones, el Sr. Xavier Armando Morales Torres y la Sra. Nélida Torres Maldonado. Por la Defensa, prestó testimonio pericial el Dr. Víctor José Lladó Díaz. Como testigo de refutación del Ministerio Público, declaró el Dr. Raúl López Menéndez.

Surge del expediente que las partes estipularon los testimonios de la patóloga, Dra. Irma Rivera Diez, así como las declaraciones de Ana Abigail Torres Cruz y Murphy Rivera Alicea, ambos funcionarios del Instituto de Ciencias Forenses (ICF). En cuanto a las declaraciones del Agte. Daniel Cartagena y la Sra. Juanita Maldonado Santiago, el Ministerio Público los puso a disposición de la Defensa,[16] quien informó que no iba a utilizarlos.[17]

Ponderada la totalidad de la prueba vertida, el 19 de mayo de 2023, el TPI declaró no ha lugar la defensa por incapacidad mental y emitió los **fallos de culpabilidad** contra el señor Morales Negrón por todos los cargos imputados.[18] En consecuencia, el 7 de

---

[16] Véase, Autos JVI2021G0015, pág. 258 (reverso); TPO pág. 237 líneas 24-29.
[17] Véase, Autos JVI2021G0015, pág. 266; TPO pág. 239 líneas 18-19.
[18] Véase, TPO pág. 347 líneas 12-24.

septiembre de 2023, el TPI lo condenó a extinguir las siguientes

**sentencias carcelarias**:[19]

| | | | |
|---|---|---|---|
| Art. 93A<br>Código Penal<br>JVI2021G0015 | 99 años | Concurrente |
| Art. 93A<br>Tentativa Código Penal<br>JVI2021G0016 | 20 años | Concurrente |
| Art. 93A<br>Tentativa Código Penal<br>JVI2021G0017 | 20 años | Concurrente |
| Art. 93A<br>Tentativa Código Penal<br>JVI2021G0018 | 20 años | Concurrente |
| Art. 6.14B<br>Ley de Armas<br>JLA2021G0187 | 10 años[20] | Consecutivo |
| Art. 6.14A<br>Ley de Armas<br>JLA2021G0188 | 10 años[21] | Consecutivo |
| Art. 6.14A<br>Ley de Armas<br>JLA2021G0189 | 10 años[22] | Consecutivo |
| Art. 6.14A<br>Ley de Armas<br>JLA2021G0190 | 10 años[23] | Consecutivo |
| Art. 6.09<br>Ley de Armas<br>JLA2021G0191 | 48 años[24] | Consecutivo |
| Art. 6.22<br>Ley de Armas<br>JLA2021G0192 | 12 años[25] | Consecutivo |
| Art. 6.14A<br>Ley de Armas<br>JLA2021G0193 | 10 años[26] | Consecutivo |
| Art. 2.8<br>Ley 54-1989<br>JLE2021G0363 | 8 años | Concurrente |
| Art. 2.8<br>Ley 54-1989<br>JLE2021G0364 | 3 años | Concurrente |

Inconforme con el resultado, el 2 de octubre de 2023, el señor

Morales Negrón presentó una *Apelación Criminal*. Señaló la comisión

de los siguientes errores:[27]

---

[19] Véanse, 13 Tomos Autos Originales.

[20] Aplicación del Artículo 6.01, *Agravamiento de las Penas*, de la Ley de Armas de 2020, 25 LPRA sec. 466.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Transcribimos los errores planteados en el *Alegato del Apelante*, distintos a los de la *Apelación Criminal*, ya que el señor Morales Negrón no renunció a presentar errores adicionales de Derecho, tras la debida evaluación del expediente y la totalidad de la prueba oral desfilada durante el juicio en su fondo, citando a *Henderson v. US,* 133 S Ct. 1121; 2013 y *Pueblo v. Soto Ríos,* 95 DPR 483 (1967).

**Primero**: Erró el Tribunal de Primera Instancia al declarar culpable al apelante aun cuando la prueba de cargo no estableció su imputabilidad más allá de duda razonable, en violación al [*sic*] su derecho a la presunción de inocencia y al debido proceso de ley, garantizado por el Art. II, Sección 7 de la Constitución de Puerto Rico.

**Segundo**: Erró el Tribunal de Primera Instancia al declarar culpable al acusado, a pesar de que [é]ste rebatió la presunción de cordura y el ministerio fiscal no cumplió con su obligación de probar la cordura del acusado al momento de los hechos más allá de duda razonable, en violación al derecho del acusado a la presunción de inocencia y al debido proceso de ley, garantizados por el Art. II, Sección 7 de la Constitución de Puerto Rico.

**Tercero**: La convicción y sentencia del apelante por cinco (5) cargos de apuntar o disparar con un arma de fuego (Art. 6.14 de la Ley de Armas) es contraria al principio de consunción establecido en el Art. 9 (b) del Código Penal, pues simultáneamente fue acusado y convicto por delitos de mayor alcance de protección a la vida, de asesinato y tentativa de asesinato a base de los mismos actos de apuntar y disparar con un arma de fuego hacia una persona, en violación al derecho del acusado al debido proceso de ley, garantizado por el [A]rt. II, Sección 7 de la Constitución de Puerto Rico.

**Cuarto**: Cometió error el Tribunal de Primera Instancia [al] duplicar la pena en las sentencias por infracción a los Artículos 6.14 y 6.22 de la Ley de Armas de 2020 mediante la aplicación del Art. 6.01 de la misma Ley, aun cuando las acusaciones no incluyeron las circunstancias agravantes necesarias para activar dicho Artículo, en violación al derecho del acusado a la adecuada notificación de los cargos en su contra y al debido proceso de ley, garantizados por el Art. II, Secciones 7 y 11 de la Constitución de Puerto Rico y las Enmiendas Quinta, Sexta y Decimocuarta de la Constitución de los Estados Unidos.

Luego de conceder las prórrogas solicitadas por las partes, el 24 de marzo de 2025, el señor Morales Negrón instó el *Alegato del Apelante*. El Pueblo de Puerto Rico, por conducto de la Oficina del Procurador General, presentó *Alegato de El Pueblo* el 23 de abril de 2025. Con el beneficio de ambas comparecencias, los Autos Originales y la Transcripción de la Prueba Oral de oficio enmendada (TPO),[28] resolvemos.

---

[28] A la TPO se integraron correcciones ortográficas y las enmiendas según presentadas por las partes el 18 de noviembre de 2024 y 2 de diciembre de 2024.

## II.

## A.

## (i)

La Constitución de Puerto Rico establece como derecho fundamental que a toda persona acusada de delito le cobija la presunción de inocencia. Art. II, Sec. 11, Const. PR, LPRA Tomo 1. Por consiguiente, para emitir un fallo de culpabilidad, **el Ministerio Público tiene la carga probatoria para demostrar, más allá de duda razonable, todos los elementos del delito y su conexión con la persona acusada**. *Pueblo v. Toro Martínez*, 200 DPR 834; 856 (2018); *Pueblo v. García Colón I*, 182 DPR 129, 174 (2011); *Pueblo v. Santiago et al.*, 176 DPR 133, 143 (2009). Claro, lo anterior no equivale a que se tenga que probar la culpabilidad del acusado con certeza matemática. *Pueblo v. Toro Martínez, supra*, pág. 856; *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 71 (1991). Para determinar que la prueba controvierte la presunción de inocencia, se exige prueba satisfactoria y suficiente en derecho. *Pueblo v. Toro Martínez, supra*, pág. 856; *Pueblo v. García Colón I, supra*, págs. 174-175. Es decir, la norma de suficiencia de la prueba, según la Regla 110 de Procedimiento Criminal,[29] conlleva que se absuelva al acusado si existe duda razonable luego de un estudio de la totalidad de la evidencia. La prueba que justifique una convicción tiene que ser satisfactoria, de modo que "produzca la certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 100 (2000). Esto significa que, si la prueba admitida por el acusador produce insatisfacción en el ánimo del juzgador, entonces, existe duda razonable y fundada. *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986). En atención a este principio, los foros apelativos debemos

---

[29] 34 LPRA Ap. II, R. 110.

tener la misma satisfacción y tranquilidad al evaluar la prueba en su totalidad. *Pueblo v. Casillas, Torres*, 190 DPR 398, 415 (2014); *Pueblo v. Colón Burgos*, 140 DPR 564, 581 (1996).

Como se sabe, **la presunción de inocencia asiste al acusado hasta el fallo de culpabilidad**. En los remedios postsentencia, la carga de persuadir al tribunal recae en el acusado. E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, San Juan, Ediciones Situm, 2018, Sec. 4.3, pág. 154. "Recordemos que con el fallo de culpabilidad —mediante el cual se entenderán probados los delitos imputados más allá de duda razonable— acaba la presunción de inocencia y nace la presunción de corrección del dictamen". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 149 (2020). Esto es así, porque la apreciación imparcial de la prueba que hagan los juzgadores de hechos merece respeto y confiabilidad. *Pueblo v. Rosario Cintrón*, 102 DPR 82, 83 (1974).

Además, las determinaciones de hechos probados que hizo el juzgador primario no se deben descartar arbitrariamente, a menos que, de la prueba admitida, surja que no existe base suficiente para apoyarlas. *Pueblo v. Acevedo Estrada, supra*, pág. 99. A tales efectos, sólo cederá la deferencia en etapa apelativa si: (1) hubo prejuicio, parcialidad o pasión, o (2) la prueba no concuerda con la realidad fáctica, es increíble o imposible. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 481 (2013). A estos fines, queda claro que la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es un asunto de hecho y derecho, revisable en apelación. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023); *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 472 (1988).

**(ii)**

De otro lado, se conoce que nuestro esquema probatorio está revestido de deferencia a las determinaciones que hacen los

juzgadores de primera instancia en cuanto a la prueba testifical, ya que ese foro está en mejor posición para aquilatarla. *Pueblo v. De Jesús Mercado, supra*, págs. 477-478. Así ha opinado nuestro alto foro:

> Como regla general, un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad para sustituir las determinaciones del foro primario por sus propias apreciaciones. **Este Tribunal ha reafirmado que las determinaciones de hechos del Tribunal de Primera Instancia a las que sustente prueba oral merecen gran deferencia de los tribunales apelativos**. Ese axioma está basado en consideraciones lógicas, ya que el magistrado del foro primario es quien ha tenido la oportunidad de contactar directamente ese tipo de prueba. *Id.*, pág. 478. (Énfasis nuestro y citas suprimidas).

Al respecto, el Tribunal Supremo ha acotado que es "[e]l juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad". *Pueblo v. García Colón I, supra*, pág. 165. Es de esta manera, porque

> [t]ambién hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y, sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación. *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975).

Por ende, cuando convergen asuntos de suficiencia de la prueba y deferencia en cuanto a la apreciación de la prueba testifical, como foro apelativo, nos corresponde examinar si la determinación de credibilidad del foro de instancia rebasó los límites

de la sana discreción judicial. Véase, *Pueblo v. De Jesús Mercado*, *supra*, pág. 484.

**B.**

**(i)**

El Artículo 92, *Asesinato*, del Código Penal de 2012 define el delito como el acto de "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA sec. 5141. En cuanto al *Asesinato en Primer Grado*, el Inciso (a) del Artículo 93, *Grados de Asesinato*, del Código Penal, 33 LPRA sec. 5142, dispone que "**[t]odo asesinato perpetrado** por medio de veneno, acecho, tortura, o **a propósito o con conocimiento**" constituye el delito de *Asesinato en Primer Grado*. (Énfasis nuestro). Es decir, "[l]os hechos sancionados en las leyes penales requieren que se actúe a propósito, con conocimiento o temerariamente, salvo que expresamente se indique que baste actuar negligentemente". Art. 23 (a) del Cód. Penal, 33 LPRA sec. 5036 (a).

Conforme con el ordenamiento penal, la *intención* es equivalente a actuar *a propósito, con conocimiento* o *temerariamente.* Art. 14 del Cód. Penal, 33 LPRA sec. 5014(z.1). "Una persona actúa a propósito cuando el objetivo consciente de la persona es cometer el delito". Art. 14 del Cód. Penal, 33 LPRA sec. 5014(kk). Asimismo, *a sabiendas* es sinónimo de la frase *con conocimiento*. Art. 14 del Cód. Penal, 33 LPRA sec. 5014(a).

> [L]a doctrina ha expresado que existen tres distintas formas o modalidades de la intención: (1) propósito, (2) conocimiento y (3) temeridad. En términos generales, un sujeto actúa a "propósito" cuando su objetivo es cometer el delito. De otra parte, el autor actúa "con conocimiento" cuando sabe que la comisión del delito es una consecuencia necesaria de sus actos. Por otro lado, un sujeto actúa "temerariamente" cuando es consciente de que su conducta crea un riesgo injustificado de producir un delito". L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, Publicaciones JTS, 2da ed., 2013, págs. 152-153.

Para que se configure la intención no se requiere de una previa planificación ni de que se conciba con mucho tiempo de antelación a los hechos. Ésta puede formarse unos minutos previo a su ejecución. *Pueblo v. Echevarría Rodríguez I*, 128 DPR 299, 368 (1991). En suma, se comete asesinato en primer grado cuando *a propósito* se da muerte a un ser humano. Esto es, cuando "**la persona tiene un deseo específico de efectuar el acto y quiere producir el resultado, ratificándolo con su actuación**". (Énfasis nuestro). *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 248-249 (2011).

**(ii)**

El Artículo 35 del Código Penal de 2012, 33 LPRA sec. 5048, define la tentativa "[...] cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y **la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad**". (Énfasis nuestro). Véase, *Pueblo v. Carmona, Rivera*, 143 DPR 907, 914 (1997). En otras palabras, con la tentativa hay "ausencia de lo que generalmente se considera el resultado dañino de una determinada conducta delictiva". D. Nevares Muñiz, *Derecho Penal Puertorriqueño: parte general*, 7ma ed. rev. San Juan, Ed. Inst. para el Desarrollo del Derecho, 2015, pág. 318. La profesora Nevares Muñiz enumera los requisitos de la tentativa de un delito:

> 1) la realización de una acción u omisión;
> 2) a propósito o con conocimiento y de forma inequívoca —sin duda alguna— a cometer un delito;
> 3) que constituya la fase inmediatamente anterior o el primero de los actos exigidos por el tipo; y
> 4) un resultado que no se ha verificado o consumado por causas ajenas a la voluntad del actor. [...]
>
> .      .      .      .      .      .      .      .
>
> [L]os actos deben conducir el resultado conforme la intención o propósito del autor [...]. D. Nevares Muñiz, *Código Penal de Puerto Rico*, 3ra ed. rev. y actualizada, San Juan, Ed. Inst. para el Desarrollo del Derecho, 2015, págs. 70-71. (Citas suprimidas).

El Artículo 36 del Código Penal, 33 LPRA sec. 5049, apareja la pena a imponer en los casos de tentativa:

> Toda tentativa de delito grave conlleva una pena igual a la mitad de la pena señalada para el delito consumado, no pudiendo exceder de diez (10) años la pena máxima de la tentativa. Toda tentativa de delito que conlleve una pena de reclusión por un término fijo de noventa y nueve (99) años, conlleva una pena de reclusión por un término fijo de veinte (20) años.

## C.

### (i)

El Artículo 6.09 de la Ley de Armas de 2020, 25 LPRA sec. 466h, tipifica como delito la portación, posesión o uso ilegal de armas automáticas. En particular, el estatuto dispone:

> Toda persona que **porte, posea o use sin autorización de esta Ley** un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de estas o cualquiera otra **arma que pueda ser disparada automáticamente** o escopeta de cañón cortado a menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal, o cualquier pieza o artefacto que convierte en arma automática cualquier arma de fuego, incurrirá en delito grave, y convicta que fuere será sancionada con pena de reclusión por un término fijo de veinticuatro (24) años, sin derecho a sentencia suspendida, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o a cualquier alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. (Énfasis nuestro).
>
> .        .        .        .        .        .        .        .

El término *portación* significa "la posesión inmediata o la tenencia física de una o más armas de fuego, cargadas o descargadas, sobre la persona del portador o a su alcance inmediato. Por alcance inmediato se entenderá al alcance de su mano y la transportación de las mismas". Art. 1.02 de la Ley de Armas, 25 LPRA sec. 461a(gg).

### (ii)

En lo que concierne al caso de autos, las modalidades (A) y (B) del Artículo 6.14 de la Ley de Armas de 2020, 25 LPRA sec. 466m, establecen lo siguiente:

> Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:
>
> (a) voluntariamente **dispare cualquier arma de fuego** fuera de los lugares autorizados por esta Ley, **aunque no le cause daño a persona alguna**; o
>
> (b) intencionalmente **apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna**. (Énfasis nuestro).
>
> .      .      .      .      .      .      .      .

Según se desprende del precitado articulado, se tipifican dos (2) conductas distintas: apuntar un arma de fuego y disparar un arma de fuego. Para que se entiendan configurados los delitos, al acto de apuntar o disparar, se suma la concurrencia del elemento subjetivo y las demás circunstancias para ello.  A saber, en el Inciso (a), el elemento de temeridad, disparar y que el acto se cometa fuera de los lugares autorizados. En el Inciso (b), el elemento intencional y apuntar a una persona. La pena que apareja la conducta proscrita es de cinco (5) años.

### (iii)

El Artículo 6.22 de la Ley de Armas de 2020, 25 LPRA sec. 466u, dispone como sigue:

> **Se necesitará una licencia de armas vigente**, de armero o ser un agente del orden público, según sea el caso, para fabricar, solicitar que se fabrique, ofrecer, comprar, vender o tener para la venta, guardar, almacenar, entregar, prestar, traspasar o en cualquier otra forma disponer de, **poseer, usar, portar o transportar municiones**, conforme a los requisitos exigidos por esta Ley. Se necesitará un permiso expedido por el Negociado de la Policía para comprar pólvora. Toda infracción a este Artículo constituirá delito grave, y será sancionada con pena de reclusión por un término fijo de seis (6) años. (Énfasis nuestro).

### (iv)

En cuanto a la duplicidad de las penas, el Artículo 6.01 de la Ley de Armas de 2020, 25 LPRA sec. 466, *Agravamiento de las Penas*, dispone que si se "**usare un arma en la comisión de cualquier delito** y como resultado de tal violación, **alguna persona**

**sufriera daño físico o mental**, la pena establecida para el delito se **duplicará**". (Énfasis nuestro). En atención al articulado predecesor, la penalidad ha superado el crisol de nuestro Tribunal Supremo. Véase, *Pueblo v. Concepción Guerra*, 194 DPR 291 (2015). El Artículo 6.01 de la Ley de Armas de 2020 dispone sobre el cumplimiento consecutivo de todas las penas de reclusión bajo el estatuto y cualquier otra ley.

**D.**

La *Ley para la Prevención e Intervención con la Violencia Doméstica*, 8 LPRA sec. 601 *et seq.*, (Ley 54) reconoce como política pública que **la violencia doméstica es uno de los problemas más graves y complejos que confronta nuestra sociedad**. Art. 1.2 de la Ley 54, 8 LPRA sec. 601. El estatuto repudia de manera enérgica esta conducta por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general. *Id*.

A esos efectos la Ley 54 define la *orden de protección* como aquel "mandato expedido por escrito bajo el sello de un tribunal, en la cual se dictan las medidas a un agresor para que se abstenga de incurrir o llevar a cabo determinados actos o conducta constitutivos de violencia doméstica". Art. 1.3 (i) de la Ley 54, 8 LPRA sec. 602 (i). En armonía, el Artículo 2.8 de la Ley 54, 8 LPRA sec. 628, penaliza la violación de la orden protección.

> **Cualquier violación a sabiendas de una orden de protección expedida**, de conformidad con esta Ley, **será castigada como delito grave** de tercer grado en su mitad inferior,[30] disponiéndose que los tribunales vendrán obligados a imponer supervisión electrónica, de concederse cualquier tipo de sentencia suspendida. (Énfasis nuestro).

---

[30] El Artículo 16 (c) del Código Penal de 2004 (derogado), 33 LPRA ant. sec. 4644 (c), establecía que el delito grave de tercer grado aparejaba una pena de reclusión fluctuante entre tres años y un día y ocho años.

El Artículo 3.2 de la Ley 54, 8 LPRA sec. 632, tipifica el delito de *Maltrato Agravado* en varias modalidades. En lo que es atinente al caso de marras, el estatuto dispone:

> Se impondrá **pena correspondiente a delito grave** de tercer grado en su mitad inferior[31] cuando en la persona del cónyuge, ex cónyuge o de la persona con quien se cohabita o se haya cohabitado, o con quien se sostiene o haya sostenido una relación consensual, o con quien se haya procreado un hijo o hija, independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación, se incurriere en maltrato según tipificado en esta Ley, mediando una o más de las circunstancias siguientes:
>
> (a) **Se penetrare en la morada de la persona o en el lugar donde esté albergada** y se cometiere allí maltrato, en el caso de cónyuges o cohabitantes, independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación, cuando éstos estuvieren separados o mediare una orden de protección ordenando el desalojo de la residencia a una de las partes. (Énfasis nuestro).
>
> .      .      .      .      .      .      .      .

### E.

Como hemos mencionado, en nuestro ordenamiento jurídico, una persona puede ser sancionada penalmente únicamente si actuó a propósito, con conocimiento, de manera temeraria o negligente, con relación a un resultado o circunstancia proscrita por ley. El elemento subjetivo del delito se manifiesta por las circunstancias relacionadas con el hecho, la capacidad mental, las manifestaciones y conducta de la persona. Art. 21 del Código Penal de 2012, 33 LPRA sec. 5034. Por tanto, de no ser suficiente la capacidad mental del actor para que se configure la forma de culpabilidad o elemento mental requerido por el delito "se consideraría como un caso de inimputabilidad [...]". *Pueblo v. Cotto García*, 205 DPR 237, 249-250 (2020), que cita a D. Nevares Muñiz, *Derecho Penal Puertorriqueño*, *op. cit.*, pág. 194. **Es decir, la incapacidad mental es eximente de responsabilidad criminal**. Por lo que, frente a la ausencia de tal

---

[31] *Id.*

capacidad, no cabe hablar de la responsabilidad penal del imputado. *Pueblo v. Santiago Torres*, 154 DPR 291, 299 (2001); *Pueblo v. Ríos Maldonado*, 132 DPR 146, 164-165 (1992).

En armonía con lo anterior, el Código Penal de 2012 establece en su Artículo 38, 33 LPRA sec. 5061, que "[n]adie será sancionado por un hecho que constituya delito si al momento de su comisión no es imputable". Entre las causas de inimputabilidad, se menciona la incapacidad mental. En cuanto a ésta, el Artículo 40 del Código Penal de 2012, 33 LPRA sec. 5063, indica:

> No es imputable quien, al momento del hecho, a causa de enfermedad o defecto mental, **carece de capacidad suficiente para comprender la criminalidad del acto o para conducirse de acuerdo con el mandato de ley**.
>
> Los términos enfermedad o defecto mental no incluyen una anormalidad manifestada sólo por reiterada conducta criminal o antisocial.
>
> Para efectos de la prueba de incapacidad mental, **el imputado deberá evidenciar la alegada incapacidad**. (Énfasis nuestro).

Ahora bien, la ley presume que el estado normal es el de la cordura. Ésta es una presunción justificada por la experiencia humana y por consideraciones de orden público. Por ende, **existe una presunción de que el imputado de delito estaba en su sano juicio al momento de perpetrar el acto criminal**. En virtud de esa presunción, el Ministerio Público no tiene que presentar prueba alguna para demostrar que el acusado estaba cuerdo en ese momento. Claro está, si el acusado arguye la insanidad mental como eximente de responsabilidad, se permite el ofrecimiento de evidencia que pueda engendrar una duda sobre su cordura. Entonces, de lograr rebatirse la presunción, el Ministerio Público debe probar más allá de duda razonable el sano juicio del acusado, como cualquier otro elemento del delito. Por su parte, **el juzgador justipreciará el hecho de la sanidad o insanidad a base de toda la prueba presentada**. *Pueblo v. Alsina*, 79 DPR 46, 60-61 (1956). Al respecto,

el alto foro ha expresado que la prueba para sustentar la defensa debe ser admisible y tener valor probatorio:

> [U]na cosa es el grado de distención que permite la regla en pro de que el acusado cuente con esta defensa —salvaguardando los derechos del Estado como ya hemos mencionado— y otra distinta es **cuál ha de ser el valor probatorio de la prueba presentada y admitida**. La Regla 74 [de Procedimiento Criminal] busca evitar que el elemento sorpresa perjudique al Estado, asunto que no guarda relación con la admisibilidad y el valor probatorio de la prueba. *Pueblo v. Cotto García, supra,* pág. 262. (Énfasis nuestro).

La mencionada norma regula el proceso para presentar la defensa de inimputabilidad por incapacidad mental. En su parte pertinente, la Regla 74 de Procedimiento Criminal, 34 LPRA Ap. II, R. 74, dispone:

> Cuando el acusado hiciere alegación de no culpable e intentare establecer la defensa de trastorno mental transitorio o de incapacidad mental en el momento de la alegada comisión del delito imputándole, o cuando su defensa fuera la de coartada, deberá presentar en el Tribunal de Primera Instancia un aviso al efecto, con notificación al fiscal, dentro de los veinte (20) días siguientes al acto de la lectura de la acusación en los casos en que deba celebrarse dicho acto. Cuando se hubiere entregado personalmente al acusado una copia de la acusación, el término para la presentación de estas mociones será de no más de veinte (20) días desde que el acusado hubiese respondido. Cuando no hubiese contestado, el término será de no más de veinte (20) días después de que se registre la alegación de no culpable. [...]
>
> El acusado que desee establecer la defensa de incapacidad mental o de trastorno mental transitorio deberá suministrar al Ministerio Público, al momento de plantearla, la siguiente información:
>
> (a) Los testigos con los que se propone establecer la defensa de incapacidad mental o trastorno mental transitorio.
>
> (b) La dirección de dichos testigos.
>
> (c) Los documentos a ser utilizados para sostener la defensa, supliendo copia de los mismos, y de no poseerlos, informar en poder de quién se encuentran tales documentos, autorizando a que los mismos sean fotocopiados.
>
> (d) Hospital u hospitales en que estuvo recibiendo tratamiento y las fechas en que lo recibió.
>
> (e) Médicos o facultativos que hubiesen tratado o atendido al imputado en relación a su incapacidad mental o condición de trastorno mental transitorio.
>
> .     .     .     .     .     .     .     .

**III.**

Esbozado el marco legal atinente, examinemos a continuación los testimonios justipreciados por el TPI en el juicio en su fondo.

### *Agte. Kelvin Morales Negrón*

El oficial de la Policía de Puerto Rico por 28 años estaba adscrito al Distrito de Villalba para la fecha de los hechos.[32] Luego de una llamada unos diez (10) minutos antes, el 12 de agosto de 2021 a las 4:30 de la tarde, se dirigió al Barrio Higüero en Villalba.[33] Arribó a la escena donde escuchó a una fémina gritando y vio al occiso boca abajo que yacía con una herida en la parte posterior de la cabeza. Desenfundó su arma y se ubicó al lado de un vehículo blanco en la parte del patio lateral de la residencia de dos (2) niveles.[34]

P. Ok. ¿Qué fue lo que pasó una vez usted toma cobertura detrás de ese vehículo blanco?

R. Cuando estoy en ese vehículo blanco tomando cobertura, una fémina se asoma por una ventana lateral de esa residencia.

P. ¿Como era esa fémina?

R. Una señora mayor.

P. Ok, ¿Y qué pasó una vez usted la vio?

R. Pues esa fémina me grita, ¡Policía, me mata, me mata, está armado, ¡Me quiere matar!

P. ¿En qué tono se lo gritó?

R. Gritando desesperada.

P. ¿Qué sucedió una vez ella hace esas manifestaciones?

**R. Cuando ella me grita esa manifestación, yo le pregunto dónde se encuentra esa persona armada. Ella desesperada, gritando acá dentro de la residencia. ¡Me mata! ¡Me mata! En esos momentos a través de un cristal roto de la puerta lateral de esa residencia, una puerta doble, hay un cristal roto por un ladito observo un rostro de una persona masculina, que me observa desde adentro de la residencia, a lo cual yo dirijo mi arma de fuego hacia ese lugar y con voz fuerte y clara le grito ¡Policía, suelta el arma y salga con las manos en alto!, en repetidas ocasiones.**

---

[32] TPO pág. 51 líneas 19-29.
[33] TPO págs. 53 líneas 16-28; 54 líneas 1-2; 61 líneas 20-26; 62 línea 11.
[34] TPO pág. 54; 62 líneas 12-19.

P. ¿Cómo usted pudo identificar que era un rostro masculino?

R. El cristal estaba roto y se veía hacia dentro y él me observaba en esta forma, observándome y mirando hacia fuera y entonces lo identifiqué.

**P. ¿Qué pasó una vez usted le da esos comandos en repetidas ocasiones?**

**R. Cuando le di los comandos, de repente una persona masculina abre la puerta lateral de esa residencia y lanza un arma de fuego, una pistola color negra, en mi dirección donde yo me encontraba. En esta forma cayendo donde yo me encontraba como a 4 pies de distancia.**[35]

P. Que el récord refleje que el testigo hizo un gesto con su mano hacia el frente.

Juez. Sí.

P. ¿Dónde se encontraba esa persona específicamente cuando usted le menciona al Tribunal que él arrojó esa arma?

R. Se encontraba en la marquesina de la residencia, la parte lateral.

P. ¿A qué distancia usted se encontraba de esa persona?

R. Como a 10 pies.

P. ¿Dónde específicamente cayó esa arma que usted menciona que él arrojó?

R. Cayó a mi lado derecho en el suelo.

P. ¿Le pregunto si esa persona que usted vio arrojar, esa arma usted la [ha] vuelto a ver en la tarde hoy?

R. Sí.

P. ¿Dónde se encuentra esa persona?

R. Se encuentra aquí a mi lado izquierdo.

P. Su señoría que se haga constar que se [ha] identificado al imputado, al acusado.

**En ese momento que esa persona, que usted identificó como el acusado, lanza esa arma hacia dónde usted estaba, ¿Qué pasó luego inmediatamente?**

**R. Pues inmediatamente esa persona que lanza el arma de fuego sale con las manos en alto y me dice: "Yo te conozco. Me voy a entregar".**

**P. ¿En qué tono le dijo eso?**

**R. Un tono tranquilo.**

**P. ¿Cuál era el estado anímico de esa persona en ese momento?**

**R. En esos momentos yo lo noté tranquilo.**[36] (Énfasis nuestro).

---

[35] En sala, el agente del orden público reconoció el arma que el apelante lanzó en su presencia. TPO págs. 59 líneas 25-29; 60 líneas 1-2.

[36] TPO págs. 55 líneas 4-29; 56 1-24; véase, TPO pág. 60 líneas 23-24; 63 líneas 10-13.

El agente Morales Negrón indicó que **el apelante siguió sus comandos verbales de no bajar las manos, caminar lentamente y arrodillarse en el suelo**.[37] "Cuando le doy los comandos verbales, él sale caminando y se arrodilla en la parte lateral de la residencia, frente a la marquesina".[38] **El testigo arrestó al señor Morales Negrón y le leyó las advertencias en el lugar**.[39]

El funcionario del orden público afirmó que **el apelante continuó hablando y le dijo tranquilamente: "No te tiré porque te conozco, si llega ser el Teniente y el Sargento que vinieron aquí, les tiraba**".[40] (Énfasis nuestro). Aunque el testigo aclaró que no conocía al apelante, era posible que éste sí lo conociera.[41]

> P. Si para usted. Cuando le dicen yo te conozco, usted dice que no lo conoce, pues para usted no tiene sentido.
>
> R. Bueno, puede tenerlo o puede ser que él me conozca a mí, pero que yo no lo conozca a él.[42]

Luego de haberlo detenido, el testigo afirmó que, en tono tranquilo, pasivo y normal, **el apelante enunció: "Si no se me traba el gatillo, mato dos o tres más"**. "**Lo maté porque me jodieron la vida. Con embustes me quitaron todo**". (Énfasis nuestro). Cuando la señora mayor salió, **el señor Morales Negrón manifestó: "Ellos tienen la culpa"**.[43] (Énfasis nuestro). Temerosa y asustada, la señora le expresó al apelante que era un abusador y que había matado a su hijo. El apelante ripostó: "**Lo maté por tu culpa, tú tienes la culpa de que yo lo matara**".[44] (Énfasis nuestro). Estas expresiones las hizo a pesar de habérsele advertido en varias ocasiones que no declara.[45]

---

[37] TPO págs. 56 líneas 25-29; 57 líneas 1-2.
[38] TPO pág. 66 líneas 11-2.
[39] TPO pág. 66 líneas 11-13. Además, una vez arrestado, el apelante leyó, entendió y firmó las advertencias. TPO pág. 60 líneas 15-19.
[40] TPO págs. 58 líneas 18-29; 66 línea 30.
[41] TPO págs. 63 líneas 14-15; 64 líneas 2-7.
[42] TPO pág. 64 líneas 2-5.
[43] TPO págs. 57 líneas 6-16; 58 líneas 1-5; 66 líneas 14-22.
[44] TPO pág. 58 líneas 7-17.
[45] TPO págs. 66-68.

### Agte. Jimmy Hernández Pagán

El oficial del orden público ha laborado en la Policía de Puerto Rico por 25 años.[46] El día de los hechos, acompañó al agente Morales Negrón a la escena en el Barrio Higüero.[47] Al llegar, observó al occiso que yacía en el pavimento. Acto seguido, vio a una señora corriendo y gritando, por lo que se aseguró de retirarla de la zona de peligro.[48] Llamó al centro de mando para reportar a la persona herida; y al regresar, se unió a varios compañeros, que custodiaban al apelante ya bajo arresto y a quien identificó en sala.[49] Mientras transportaban al señor Morales Negrón, **el testigo se quedó custodiando el arma de fuego Glock color negra**, hasta el arribo de la Sgto. Clara Feliciano Rodríguez.[50] A petición del Ministerio Público, el testigo identificó el arma ocupada.[51]

### Sgto. Clara Feliciano Rodríguez

La agente investigadora ha laborado para la Policía por 28 años.[52] Llegó a la escena a las 5:35 de la tarde, ocasión en que observó el cuerpo de la víctima boca arriba en el pavimento, de quien estimó tenía unas cinco (5) heridas de bala: en el ojo derecho, en la parte de atrás de la cabeza, dos (2) en el costado y cerca del estómago.[53] A la víctima lo identificó su esposa, Ivette Rosario Muñiz, quien se encontraba en la escena.[54] Allí, la testigo advino en conocimiento de que la persona arrestada era el padre del occiso.[55] Denny Amílcar Morales Torres era hijo del apelante y de la señora Nélida Torres Maldonado.[56]

---

[46] TPO pág. 71 líneas 18-19.
[47] TPO pág. 72 líneas 2-12.
[48] TPO págs. 72 líneas 21-27; 76 líneas 1-3.
[49] TPO pág. 73 líneas 12-24.
[50] TPO págs. 74 líneas 1-4 y 17-25; 78 líneas 20-22.
[51] TPO págs. 75 líneas 5-15.
[52] TPO pág. 80 líneas 25-29.
[53] TPO págs. 82 líneas 16-25; 85 líneas 25-29; 93 líneas 21-30; 94 líneas 1-2.
[54] La esposa del occiso movió el cuerpo de boca abajo a boca arriba. TPO pág. 103 líneas 27-30.
[55] TPO págs. 83 líneas 13-18; 94 líneas 26-30.
[56] TPO pág. 86 líneas 4-7.

La declarante atestiguó que, en la residencia, **los cristales de la puerta que daba acceso a la cocina estaban rotos, así como la ventana de aluminio del cuarto principal**, donde dormía la señora Torres Maldonado. En el interior del recinto, en la marquesina y en el patio, la testigo observó la presencia de sangre, casquillos, municiones calibre .40 sin disparar y fragmentos de bala disparados, todos recopilados en evidencia por los funcionarios del ICF para su análisis correspondiente.[57] Describió el lugar como desordenado, debido a la manera en que tuvieron que defenderse la señora Torres Maldonado, su hijo Xavier Armando y su madre Juanita.[58] De hecho, la señora Torres Maldonado le indicó que tenía una herida en el pulgar de la mano izquierda.[59] Además, había varios vehículos, entre éstos, **una *pick up* azul de dos (2) puertas**, la cual fue examinada por el personal forense. Allí se ocupó un **abastecedor de 22 balas calibre .40**.[60] En la residencia, se ocupó un **abastecedor de 15 balas calibre .40 completamente vacío**; y otro **abastecedor de [nueve] balas calibre .40, con seis (6) balas sin disparar**.[61] En total se ocuparon tres (3) abastecedores.[62] Frente a un vehículo blanco estacionado en el patio, al lado de la marquesina, se encontraba la **pistola Glock negra, serie BNTE-452**. El arma tenía un **aditamento plateado y rectangular en el *fighter pin* para convertirla en automática**.[63] La testigo reconoció el arma en sala.[64] También identificó al apelante.[65]

En el turno de contrainterrogatorio, la testigo afirmó que, durante su entrevista a la señora Torres Maldonado, ésta **indicó que el apelante era paciente de salud mental desde hace muchos**

---

[57] TPO págs. 86 líneas 8-19; 93 líneas 5-9.
[58] TPO págs. 84 líneas 18-29; 85 líneas 1-14; 91 líneas 4-17; 93 líneas 1-4.
[59] TPO pág. 94 líneas 13-18.
[60] TPO págs. 85 líneas 15-24; 92 líneas 11-24; 93 líneas 15-18.
[61] TPO pág. 95 líneas 21-24.
[62] TPO págs. 93 líneas 13-14; 95 líneas 6-15; 95 líneas 25-26.
[63] TPO págs. 86 líneas 27-30; 87 líneas 4-10 y 23-24.
[64] TPO pág. 88 líneas 1-4.
[65] TPO pág. 95 líneas 1-5.

**años**.[66] Para la víctima, el apelante parecía que estaba poseído por el demonio.[67] Aun cuando lo consideró relevante, la sargento Feliciano Rodríguez no indagó sobre cuántas veces el apelante estuvo internado en instituciones psiquiátricas.[68]

### Harry Natal Rivera

El testigo ostenta un Bachillerato de Justicia Criminal y cuenta con 19 años de experiencia como investigador forense primario en el ICF.[69] Para el 12 de agosto de 2021, en horas de la tarde, recibió una llamada que alertó un asesinato en el Barrio Higüero en Villalba y se dirigió a la escena a las 6:37 pm, junto con Alberto Cruz Ramírez, quien tomó las fotografías y videos.[70] El testigo describió la escena custodiada como un área vecinal rural.[71]

**Identificó y ocupó un arma de fuego negra Glock calibre .40 modelo 27 generación 4 (serie BNTE-452)** frente a un vehículo al lado de una casa; casquillos calibre .40 en el interior de la residencia, la marquesina y alrededor del patio; municiones, tres (3) abastecedores (capacidad de 22, 15 y 9 municiones, respectivamente) en la marquesina y dentro de un vehículo tipo *pick up* encendido; balas disparadas; y derivados de proyectil de bala.[72] **La residencia presentaba impactos de bala en la estructura y en las ventanas**.[73] En el informe no se relacionó que el arma tuviera algún aditivo.[74]

Describió que la víctima mortal yacía en la cuesta de la casa a unos 25 a 30 pies de ésta y presentaba varias heridas de bala.[75] Se observó lividez y rigidez cadavérica. Tenía una sábana encima, la

---

[66] TPO pág. 100 líneas 20-23.
[67] TPO pág. 109 líneas 1-4.
[68] TPO pág. 107 líneas 15-21.
[69] TPO págs. 7-9.
[70] TPO págs. 9 líneas 1-10; 10 líneas 6-7; 25 línea 18; 39 líneas 12-13.
[71] TPO pág. 10 línea 23.
[72] TPO págs. 11 líneas 10-11, 26-30; 12 líneas 1-5 y 14-15; 13 líneas 26-29; 15 línea 9; 17 líneas 22-29; 18 líneas 1-6; 24 líneas 6-7 y 17-19; 33-36; 46 líneas 1-17. Véase, cadena de custodia, TPO págs. 23-27.
[73] TPO pág. 45 líneas 19-27.
[74] TPO pág. 50 líneas 28-30.
[75] TPO págs. 13 líneas 13-21; 19 líneas 12-20; 22 líneas 18-19.

cual no se colectó como evidencia.[76] En su posesión, tenía una sortija dorada, un iPhone negro y $900.00 en billetes de $20.[77] El Informe de Hallazgos de Escena, fechado el 12 de agosto de 2021 y suscrito por el investigador forense Natal Rivera, fue enmendado por el funcionario para especificar la cantidad de dinero ocupada, la cual fue entregada a la viuda.[78]

### Alberto Cruz Ramírez

El investigador forense del ICF por tres (3) años declaró que atendió la escena criminal que nos ocupa. Allí, tomó videos y fotografías generales, intermedias y de acercamiento del exterior e interior de la residencia de dos (2) niveles, las cuales se admitieron en evidencia.[79] El testigo identificó y describió varias fotografías de la evidencia, según fueron presentadas. Entre éstas, por ejemplo: el exterior e interior de un vehículo impactado, varios casquillos y fragmentos de bala, el arma de fuego y una ventana rota.[80]

### Ana Abigail Torres Cruz y Murphy Rivera Alicea
(estipulados)

"[S]e estipula que para la fecha del 16 de agosto de 2021 la Sra. Ana Abigail Torres Cruz, quien es técnico de Control de Custodia del Instituto de Ciencias Forenses, recibió de parte de Harry Natal [Rivera], quien es el investigador forense principal del caso, una evidencia marcada con el AF-21-1147, la cual entregó al Sr. Murphy Rivera Alicea, quien es el supervisor del área de técnico de control y custodia del Instituto de Ciencias Forenses, quien, a su vez, la entregó a la examinadora de armas de fuego, Angélica M. Resto Rivera, quien realizó el examen a toda la evidencia presentada y fue plasmada en el Informe AF-21-1147 [...]".[81]

---

[76] TPO págs. 46 líneas 18-20; 47 líneas 17-23.
[77] TPO pág. 19 líneas 2-5 y 11.
[78] TPO págs. 16 líneas 26-29; 20 líneas 6-14; 21 líneas 8-30; 22 líneas 1-2.
[79] TPO págs. 137 líneas 23-30; 139 líneas 18-20; 140-142; 149 línea 22.
[80] TPO págs. 152 líneas 26-30; 153-154; 156-160.
[81] Véase, Autos JVI2021G0015, pág. 258. TPO pág. 237 líneas 11-23.

***Angélica M. Resto Rivera***

La testigo ha laborado por 16 años en el ICF y 14 como examinadora de armas de fuego y marcas de herramientas.[82] En el caso presente, la declarante realizó los exámenes pertinentes y redactó un certificado de análisis.[83] En particular, entre el 1 y el 15 de diciembre de 2021 examinó la pistola Glock, modelo 27, generación 4, calibre .40 (Serie BNTE-452), tres (3) abastecedores, balas, casquillos, proyectiles y sus derivados; además, se realizaron disparos de prueba.[84] Concluyó, en lo pertinente:

> El resultado número 2, la pistola descrita en la pieza 005 del caso AF-21-1147 en su condición actual es capaz de disparar en automático *full auto*. El abastecedor magazín, identificado A que explico en la pieza 5 del caso AF-21-1147 es tipo caja columna escalonada, marca Glock fabricado en Austria y tiene capacidad para aceptar 9 municiones, bajas calibre .40. El abastecedor magazín identificado B, descrito en la pieza 5 del caso AF-21-1147 es tipo caja columna escalonada, marca Glock, fabricado en Austria y tiene capacidad para aceptar 15 municiones, calibre .40.[85]
>
> .   .   .   .   .   .   .   .
>
> El abastecedor magazín identificado C descrito en la pieza 5 del caso AF-21-1147 es tipo caja columna escalonada marca Glock fabricado en Austria y tiene capacidad para aceptar 22 municiones, calibre .40.[86]
>
> .   .   .   .   .   .   .   .
>
> Número 8 los casquillos de bala marcados del E1 al E9 descritos en la pieza 7, son calibre 40 S and W fueron disparados de la pistola descrita en la pieza 5 ambos del caso AF-21-1147. El fragmento de proyectil de bala marcado E2 correspondiente a la pieza 8 es calibre .40 10 milímetro fue disparada por la pistola descrita en la pieza 005 ambos de la AF-21-1147.[87]

A preguntas del Ministerio Público sobre qué significaba la **capacidad de disparar en automático *full auto***, la declarante expresó:

> Eso lo que significa es que **esa arma de fuego en particular está alterada para disparar en automático. Lo que significa es que una vez que usted puede cargar el magazín, si el magazín tiene 5, 10, 15 o 20 balas, no importa la cantidad que**

---

[82] TPO pág. 112 líneas 19-25.
[83] TPO pág. 118 líneas 12-18.
[84] TPO pág. 123 líneas 7-20.
[85] TPO pág. 124 líneas 1-8.
[86] TPO pág. 124 líneas 21-23.
[87] TPO pág. 125 líneas 1-5.

**usted coloque en esa arma de fuego. Una vez que usted presiones ese gatillo, si usted no suelta ese gatillo todas esas municiones van a hacer disparadas de una sola ocasión esto se puede hacer debido a una alteración que tiene esa arma de fuego, no está diseñada como su manufacturero lo estableció**.[88] (Énfasis nuestro).

.        .        .        .        .        .        .        .

[...] una vez que usted coloque el magazín para que ocurra el proceso del disparo de esta manera no se puede disparar el arma, hay que dejar caer ese *slide* si usted la tiene de esta manera con las municiones ahí no pasa nada, pero si usted hace eso y presiona ese gatillo, una vez que usted deje ese dedo presionado en el gatillo, todas las municiones que estén en ese magazín dependiendo, verdad la cantidad que tenga ese magazín van [a ser] disparadas de una sola vez y eso ocurre en segundos.[89]

.        .        .        .        .        .        .        .

Si se altera un arma de fuego de su modo normal que está, verdad, está diseñada se supone que está diseñado para disparar municiones en semi automático. **Una vez tú presiones el gatillo se supone que salga una munición. Si se altera para disparar en automático una vez que se presione ese gatillo todo va a salir**.[90] (Énfasis nuestro).

### *Dra. Irma Rivera Diez*
(estipulado)

La testigo suscribió el Informe Médico Forense PAT-3401-21. La doctora Rivera Diez "declararía que es patóloga del Instituto de Ciencias Forenses y que fue quien preparó el Examen de Autopsia al cuerpo de Denny Amílcar Morales Torres. A tenor [de] dicho Informe Médico, **el cuerpo exhibía cuatro (4) heridas de balas marcadas como herida de bala A, herida de bala B, herida de bala C y herida de bala D**. Como parte de los hallazgos de la autopsia, la doctora Rivera Diez encontró: heridas de bala a la superficie corporal, patrón pulmonar compatible con aspiración de sangre y laceración, contusiones y abrasiones de la superficie corporal. **Determinó como causa de muerte: heridas de bala y como manera de muerte: Homicidio**".[91] (Énfasis nuestro).

---

[88] TPO pág. 124 líneas 12-18.
[89] TPO págs. 125 líneas 29-30; 126 líneas 1-5.
[90] TPO pág. 130 líneas 2-5.
[91] Véase, Autos JVI2021G0015, pág. 258. TPO, págs. 236 líneas 8-30; 237 líneas 1-10.

***Efraín Enrique Meléndez Quiñones***

El testigo presencial vivía en una estructura de madera, en el segundo nivel de la residencia donde ocurrieron los hechos. Al 12 de agosto de 2021, en el primer nivel, vivían la señora Torres Maldonado y el menor de sus hijos, Xavier Armando.[92] El declarante reconoció al apelante en sala, porque al mudarse, éste también habitaba la residencia.[93] El día de los hechos, alrededor de las 4:00 de la tarde, el testigo se encontraba en su habitación y escuchó tres (3) "sonidos que explotaron", los gritos de la señora Torres Maldonado y del apelante, seguidos de más detonaciones. El testigo reconocía el sonido de disparos porque su papá es policía y él le había enseñado. Desde la ventana de su sala, divisó a la víctima fatal, quien estaba corriendo y se veía alterado.[94] "**Venía desde arriba corriendo hacia abajo, gritándole a Hiram, no le dispares a mami, dispárame a mí**". (Énfasis nuestro). Lo percibió como desesperado y enojado.[95]

> P. ¿Qué pasó una vez usted ve que Denny hace esa manifestación y está acercándose por la cuesta?
>
> **R. Cuando Denny está bajando y le dice no le dispares a mami dispárame a mi continuó de 3 a 4 veces diciéndolo, él hace un movimiento como que se va a correr hacia arriba de la cuesta y en ese segundo, recibe impacto.**
>
> P. Ok. ¿Cuándo usted dice que recibe impactos a qué usted se refiere?
>
> R. Me refiero a que lo dispararon.
>
> P. ¿Cómo usted sabe que le dispararon a Denny?
>
> R. La razón por la cual yo sé que él le disparó a Denny, se vio del ángulo que yo estaba, se veía el arma.
>
> P. ¿Quién vio un arma? ¿Quién la vio?
>
> R. Yo.[96] (Énfasis nuestro).
>
> .      .      .      .      .      .      .      .
>
> P. ¿Y qué pasó con Denny cuando usted dice que el recibió unos impactos de bala, ¿qué pasó con él? ¿qué pasó con su cuerpo de lo que usted pudo observar?

---

[92] TPO págs. 164 líneas 19-30; 165 líneas 1-15.
[93] TPO págs. 165 líneas 21-24; 166 líneas 8-22.
[94] TPO págs. 166 líneas 23-30; 167-170; 178 líneas 2-6.
[95] TPO págs. 171 líneas 1-2; 172 líneas 10-11.
[96] TPO pág. 172 líneas 14-25.

> **R. Una vez que Denny fue impactado, automáticamente el cayó, Hiram salió de la casa, lo pude ver sosteniendo el arma, cuando se acerca al cuerpo él le dice, eso no era lo que tú querías.**
>
> P. ¿Quién le dice eso a Denny?
>
> R. Hiram.
>
> **P. ¿En qué tono le dijo eso Hiram a Denny?**
>
> **R. No tan calmado, pero no tan agitado.**
>
> P. ¿Como a qué distancia aproximadamente estaba Hiram de Denny cuando le dice eso?
>
> R. Como yo al micrófono, bien cerca.
>
> P. ¿Y de dónde usted ve salir a Hiram?
>
> R. Desde el balcón de la casa del primer piso él sale caminando.
>
> P. ¿Y qué era lo que tenía en las manos, usted mencionó?
>
> R. Un arma.[97] (Énfasis nuestro).

El declarante atestiguó que **el apelante se quedó mirando a la víctima, quien yacía boca abajo sin ningún movimiento, y regresó al interior de la residencia, desde donde escuchó gritos y cantazos**.[98] El señor Meléndez Quiñones llamó al 911.[99] Observó a la viuda arribar a la escena, quien al ver a su esposo empezó a gritar, mientras un oficial la sostenía. El otro policía desenfundó su arma y ordenó al atacante a soltar la suya.[100] Luego, escuchó al apelante decir tranquilamente "ya hice todo, ya me pueden arrestar".[101] La viuda sostenía en su falda el cuerpo de su marido y pidió que llamaran a una ambulancia.[102] Observó salir de la residencia a la señora Torres Maldonado herida y a su hijo Xavier Armando en *shock*.[103] La señora Torres Maldonado, a su vez, sufrió un gran impacto al ver a su hijo herido y comenzó a insultar al apelante.[104] **Todo el incidente duró una media hora**.[105] En la

---

[97] TPO pág. 173 líneas 5-20.
[98] TPO págs. 173 líneas 21-24; 185 líneas 17-21; 186 líneas 4-6 y 30; 187 líneas 1-10.
[99] TPO pág. 174 líneas 2-3.
[100] TPO págs. 174 líneas 27-30; 175 líneas 1-5.
[101] TPO pág. 175 líneas 10-16.
[102] TPO pág. 175 líneas 27-30.
[103] TPO pág. 176 líneas 1-6.
[104] TPO pág. 176 líneas 13-23.
[105] TPO pág. 183 líneas 2-4.

declaración jurada que el testigo prestó, había expresado que el apelante por lo general se escuchaba alterado.[106]

### *Xavier Armando Morales Torres*

El testigo identificó al apelante como su padre.[107] El día de los hechos, se encontraba en su cuarto jugando, en la casa también se encontraban su madre y su abuela, señoras Torres Maldonado y Maldonado Santiago, respectivamente.[108] Escuchó un ruido fuerte y salió de la habitación a la cocina, donde vio desesperadas a su madre y a su abuela en la puerta de aluminio blanca con cristales, que da hacia la marquesina, intentando cerrarla. El apelante trataba de abrir la puerta y asomó el cañón del arma entre los cristales rotos. A pesar de que intentó razonar con su padre, éste actuaba como si no le estuvieran hablando. "**No le hacía caso a mis palabras**". (Énfasis nuestro). Entre gritos y discusiones, observó al apelante por la ventana y llevó a las mujeres a la habitación principal, ya que esa puerta tenía seguro, y luego se trasladaron al baño del cuarto. El apelante, quien intentaba entrar, rompió la ventana de aluminio del cuarto. Mientras el testigo quedó atrapado entre la cama y un mueble cerca de la ventana, escuchó un disparo realizado por el apelante y su mente se nubló. Llamó a sus hermanos Denny y Kelvin. Cuando escuchó a la víctima, se asomó por la ventana rota.[109]

P. ¿Qué usted observaba?

R. Mi papá estaba chamboneando el arma y mi hermano bajando la cuesta.

P. ¿Su hermano, no lo escuché?

**R. Mi papá estaba chamboneando el arma y mi hermano estaba bajando la cuesta.**

**P. ¿A qué distancia más o menos queda esa ventana que usted dice que estaba rota que usted se asoma y que observa a su hermano? Un aproximado.**

**R. Como unos 30 metros.**

---

[106] TPO pág. 182 líneas 10-13.
[107] TPO pág. 189 líneas 1-2.
[108] TPO pág. 189 líneas 5-17.
[109] TPO págs. 189 líneas 23-30; 190-196; 200; 208 línea 16.

**P. ¿Qué es lo próximo que usted recuerda?**

**R. Vi a mi papá disparándole a mi hermano y de ahí para adelante se me nubló la mente.**[110] (Énfasis nuestro).

El testigo salió por la ventana y observó al apelante dirigiéndose a la casa. Llamó a su otro hermano Kelvin, mientras se ocultaba en un monte. Al salir, vio a los policías y a su madre herida en la mano.[111]

A preguntas de la Defensa, el testigo declaró que sabía que el apelante se medicaba, pero no las razones para requerir tratamiento.[112] Tampoco sabía si el apelante recibía alguna pensión. "No sé, esos temas yo soy el menor de la casa esos temas a mí no me correspondían y nunca me enseñaron de eso".[113] Negó haber acompañado al apelante a terapias psiquiátricas.[114]

### *Nélida Torres Maldonado*

La testigo fue esposa del apelante por 39 años, a quien identificó en sala y con quien procreó cuatro (4) hijos: Hiram Jr., Denny, Kelvin y Xavier, todos mayores de edad.[115] Para la fecha de los hechos, la pareja se encontraba separada desde abril de 2021. Al 12 de agosto de 2021, en particular, **no mantenían ninguna comunicación, ya que la declarante había solicitado una Orden de Protección** *Ex parte***, en contra del apelante, vigente desde el 10 al 31 de agosto de 2021**.[116] A dos (2) días de expedido el mandamiento de protección, la testigo se encontraba en su casa, junto a su madre Juanita y su hijo Xavier Armando, y vio al apelante llegar en un vehículo azul.[117]

R. Cuando yo lo veo yo traté de avanzar para entrar a la casa y es cuando él se baja de la guagua y no pude tener

---

[110] TPO pág. 197 líneas 2-11.
[111] TPO págs. 197-199; 201 líneas 26-30; 202 líneas 1-18.
[112] TPO págs. 206 líneas 28-30; 209 líneas 12-13.
[113] TPO pág. 207 líneas 20-21.
[114] TPO pág. 209 líneas 14-16.
[115] TPO págs. 213 líneas 21-24; 214 líneas 1-7.
[116] TPO págs. 214 líneas 9-30; 215 línea 1; 222 líneas 22-27.
[117] TPO págs. 215 líneas 11-16 y 27-28; 216 líneas 1-6.

la oportunidad de entrar y me fui hacia mi lado izquierdo, para donde estaba mi carro.

P. ¿Ese carro en referencia a la entrada de su casa donde estaba?

R. Estacionado en la marquesina, mi carro de frente hacia afuera.

P. Y usted se dirige hacia al lado izquierdo.

R. Yo me fui hacia el lado izquierdo.

P. ¿Y dónde estaba Hiram, cuando usted se dirige al lado izquierdo del carro?

**R. Él venía de frente hacia mí con un arma en las manos.**

P. ¿Qué es lo próximo que usted recuerda?

R. Yo me encontraba en el lado izquierdo, él estaba al otro lado y **yo le dije, tú me dijiste que nunca me ibas [a] hacer daño y él me dijo eso te crees tú y fue detrás de mí**, entonces yo logré irme hacia el lado derecho del carro y él se quedó al lado izquierdo y cuando lo veo que estaba mirando hacia abajo logré entrar a la casa.

P. Antes de usted entrar a la casa usted dice, que él tenía un arma de fuego en la mano, ¿que él hacía?

R. Cuando él venía hacia mí de frente yo pude ver que él tenía un arma, pero ya después no porque yo comencé a darle la vuelta al carro y ahí él quedo al otro lado donde yo no podía ver.

P. ¿Y con esa arma que él hacía?

R. No podía ver porque estaba por detrás del carro, pero como vi que bajó la mirada y se puso a bregar con lo que tenía en sus manos, ahí yo aproveché y entré a la casa.[118]

.        .        .        .        .        .        .        .

**P. Qué usted escuchaba, usted dice que no podía ver lo que él hacía con el arma, pero ¿qué usted escuchaba?**

**R. Los tiros porque él me tiró.**

**P. ¿Cuándo es que él le tiró, explícale al Juez?**

**R. Varias veces mientras iba tras de mí.**

P. Varias veces mientras iba tras de usted en el área de la marquesina.

R. Antes de yo entrar a la casa.[119] (Énfasis nuestro).

Al entrar a la casa, la señora Torres Maldonado divisó a su madre en la cocina y a su hijo Xavier Armando salir del cuarto. El apelante comenzó a disparar a la puerta principal, de aluminio y cristal. En medio del incidente, la testigo se percató de su herida en

---

[118] TPO págs. 216 líneas 9-28; 217 líneas 1-3.
[119] TPO pág. 217 líneas 7-13.

la mano izquierda y trató de salvaguardar la vida de su hijo y de su madre. Se dirigieron a su habitación y al baño. Se dio cuenta que el apelante comenzó a romper la ventana de aluminio. Éste introdujo la mano y continuó disparando. Su hijo Xavier Armando trató infructuosamente de cubrir el área con un mueble y, ante los disparos, se tiró al suelo.[120]

> **R. Hiram Morales me dijo me dejaste sin casa y sin familia yo le dije que si era por la casa que ya yo no la quería que se quedara con ella, pero por favor que se fuera que yo no iba a decir nada, pero por favor que se fuera.**
>
> P. ¿Y qué hacía Hiram?
>
> R. Pues se alejó de la ventana y es cuando mi hijo Xavier se asoma por ella y en ese momento, escucho cuando Xavier dice: Papi, no, por favor, papi, no. Escucho unos disparos y mi hijo pegó a gritar: Papi no, papi, no… y por ahí mismo se tiró Xavier.
>
> P. ¿Por dónde?
>
> R. Por la ventana.
>
> P. ¿Dónde estaba su mamá Juanita?
>
> R. Conmigo en el baño.
>
> P. ¿Cómo estaba ella, su estado de ánimo?
>
> R. Ella estaba tratando de consolarme porque yo estaba asustada.
>
> P. ¿Qué usted pensó en ese momento cuando Xavier brinca por la ventana?
>
> **R. Yo me asomé a la ventana cuando Xavier salió y es cuando me doy cuenta que mi hijo estaba tirado en la brea, en el camino.**
>
> **P. ¿Qué hijo?**
>
> **P. Denny Morales y empecé a gritar: Me mataron a mi hijo, me mató a mi hijo…** y mi mamá tratando de consolarme y yo gritaba y trataba de salir del cuarto, pero no podía porque tenía mi mano herida, luego trato de salir por la ventana y es cuando me doy cuenta que el señor Hiram Morales estaba afuera de la marquesina al lado izquierdo, custodiado por un policía […].[121] (Énfasis nuestro).

Cuando logró salir de la habitación junto a su madre, la testigo aseveró que el apelante le dijo: "**Te maté a tu hijo para que sufras**".[122] (Énfasis nuestro). Corrió hacia su hijo fallecido y gritó

---

[120] TPO págs. 217-219.
[121] TPO pág. 220 líneas 6-28.
[122] TPO pág. 221 línea 2.

para que llamaran a una ambulancia; Xavier Armando se reunió con ella en la escena para consolarla. Luego, en el hospital, intervinieron quirúrgicamente la fractura en su dedo. "Mi mano tenía casi el dedo guindando porque la bala me entró y me salió".[123]

En cuanto al estado anímico del apelante, **la señora Torres Maldonado atestiguó que éste estaba** "[c]omo siempre era él"; "[e]se día normal como era él", aunque aceptó que era **una furia distinta a otras**.[124] (Énfasis nuestro). En la Orden de Protección *Ex parte* la testigo aludió a que el apelante era un paciente psiquiátrico y dijo que eso era lo que él decía. Admitió que el apelante estuvo hospitalizado en el Hospital Panamericano.[125] Añadió luego que, cuando escuchó los disparos, pensó que el apelante se había suicidado, pero no por una cuestión psiquiátrica.[126] Durante su declaración, se trajo a colación, además, que el primogénito de la pareja, Hiram Jr., fue asesinado.[127] Otro hijo del apelante, Orlando Carrasquillo, también falleció, pero la testigo dijo que esto no afectó al apelante, que **su condición psiquiátrica era previa, ya que el apelante** "estaba buscando tratamiento para luchar su seguro social".[128]

### Dr. Víctor José Lladó Díaz

El psiquiatra, graduado en 1973, se especializa en fisiología forense.[129] Distinguió la práctica clínica de la forense al enunciar que, en el caso forense, se evalúa a la persona en el contexto de un caso legal, pero no se ofrece tratamiento como en la práctica clínica.[130]

---

[123] TPO págs. 221 líneas 4-30; 222 líneas 14-16.
[124] TPO pág. 227 líneas 9-24.
[125] TPO págs. 228-230.
[126] TPO pág. 235 líneas 18-26.
[127] TPO pág. 231 líneas 17-23.
[128] TPO págs. 234 líneas 7-24; 235 líneas 1-5.
[129] TPO págs. 239 líneas 22-27; 240 líneas 5-7.
[130] TPO pág. 240 líneas 21-23.

En el caso de autos, dijo que fue contratado por la Sociedad para la Asistencia Legal para realizar una evaluación psiquiátrica forense al señor Morales Negrón. **Realizó la examinación el 28 de enero de 2022, a través de la plataforma Zoom, en una sola sesión de 45 minutos**.[131] Para su **informe de cinco (5) páginas**, que no consta como evidencia admitida, el testigo pericial aseveró que examinó el expediente médico del Departamento de Corrección y Rehabilitación, el de Inspira (2016-2021), el del Hospital Panamericano y varias declaraciones juradas, aunque únicamente mencionó en su escrito la del agente Morales Negrón.[132] A pesar de considerarlas importantes, **en el informe se excluyeron las declaraciones juradas de los testigos presenciales**, por lo que sus versiones de los hechos fueron omitidas. Por ejemplo, no contempló las expresiones que el apelante le hizo a su hijo Xavier Armando el día de los hechos de que "si no te sales te tiro a ti también".[133] Tampoco en el informe surge que en la entrevista con el apelante se haya hecho referencia a la Orden de Protección *Ex parte* que le habían entregado apenas dos (2) días antes de los hechos.[134] El informe, a su vez, obvió el uso de sustancias controladas por parte del apelante, incluso, el día de su arresto, ni que presuntamente participaba de un programa de cannabis medicinal. El perito entendió que no era necesariamente importante incluirlo.[135]

El día de la evaluación psiquiátrica forense, el perito indicó que el apelante no se encontraba plenamente equilibrado, estaba ansioso y no era responsivo. No obstante, indicó que éste sí le habló de las muertes violentas de dos (2) de sus hijos, —por suicidio y

---

[131] TPO págs. 243 líneas 19-24; 244 líneas 1-7; 256 líneas 2-5.
[132] TPO págs. 248 líneas 21-29; 251 líneas 5-6; 257 líneas 4 y 7; 258 línea 22; 259 líneas 17-23; 260 líneas 15-19; 261 líneas 4-14; 267 línea 8; 283 líneas 12-17.
[133] TPO págs. 260 líneas 2-14; 271 líneas 6-15; 273 líneas 5-21.
[134] TPO pág. 259 líneas 1-4.
[135] TPO págs. 269-270; 281 líneas 2-3; 329 líneas 9-24.

asesinato— ambas acontecidas hace alrededor de una década.[136] Expuso que la pérdida de un familiar, como la de un hijo, era un evento perturbador y traumatizante, capaz de provocar una sacudida psicológica emocional profunda.[137]

El perito aseveró que, **del historial del apelante, surgía que padecía una condición psiquiátrica**.[138] Afirmó que, desde 1998, la Administración de Seguro Social pagaba al apelante una **pensión de incapacidad por su diagnóstico de trastorno bipolar**.[139] Declaró que, debido a este padecimiento, el apelante había estado **recluido en el Hospital Panamericano** en varias ocasiones, la más reciente, el **20 de abril de 2021**.[140]

A grandes rasgos, describió que el trastorno bipolar puede oscilar entre dos (2) polos anímicos: la depresión severa y el episodio maniaco.[141] Así, pues, **opinó que el señor Morales Negrón era inimputable**. Según el perito, **sin la enfermedad, hubiera sido menos probable la comisión de los delitos**.[142]

> Por su condición estado mental en el momento de los hechos, era afectado por su enfermedad de trastorno bipolar, estaba induciendo a actuar de la forma que lo hizo, el trastorno bipolar, trastorno maniaco que le afectarían en aquel entonces, de acuerdo a la literatura psiquiátrica **el paciente ya está enfocado en un objetivo y no hay quien los desquite de ese objetivo hasta que no se lleva a cabo**, está fija su atención en eso, no hace caso no responde, en ese momento está tan concentrado en ese objetivo un trastorno de pensamiento. **No se puede percatar de todas las circunstancias o de todas las señales, su juicio está comprometido**. Hiram no tiene la capacidad racional que es el estado psicótico que produce el trastorno bipolar, cuando está en el estado maniaco, es un grado de agitación y de excitación tan fuerte tan rebelde que vienen las acciones de la persona son inclusos irrepetibles, no logra, **ni siquiera se da cuenta que eres víctima de impulsos tras impulsos de una forma anormal o peculiar o agresiva, en este caso, destructiva**.[143] (Énfasis nuestro).

---

[136] TPO págs. 244 líneas 21-29; 245 líneas 1-2.
[137] TPO pág. 248 líneas 1-12.
[138] TPO pág. 245 línea 15.
[139] TPO pág. 247 líneas 20-28.
[140] TPO pág. 248 líneas 21-29.
[141] TPO pág. 248 líneas 15-17.
[142] TPO págs. 249 línea 10; 253 líneas 8-15.
[143] TPO pág. 249 líneas 12-25.

En general, explicó que el estado maniaco de la enfermedad produce una **pérdida de la capacidad de razonar**.[144] Describió la psicosis como la **pérdida de contacto con la realidad**, así como la **incapacidad de aquilatar las consecuencias de sus actos**.[145] Empero, aclaró que la persona afectada por el trastorno, **una vez realizado su objetivo, puede tomar decisiones, estar presta a escuchar y seguir instrucciones y tener un nivel de autoprotección**.[146] Insistió que la enfermedad del apelante lo indujo a actuar de manera impulsiva, irracional y agresiva, trazándose un objetivo delirante, sin una conciencia clara, libre o deliberada.[147]

> Sus acciones eran totalmente autodestructivas, descabelladas a plena luz del día, con testigos y siguen pasando cosas y él continúa y sigue amenazando y sigue disparando, ya son acciones que están fuera de su control, es un frenesí emocional lo que se está dando aquí, esto es continúo, reiterado y cada vez más fatídico.[148]

Sin embargo, el perito contestó en la negativa al preguntársele si tener coraje porque lo saquen de su casa mediante una orden de protección era irracional. Opinó que tampoco era irracional que, en pleno acto de la comisión del crimen, la persona obedezca comandos de las autoridades y se entregue a éstas.[149] Además, el perito declaró que no tenía conocimiento de ningún acto irracional en concreto cometido por el apelante antes de los hechos delictivos que pudiera denotar un estado maniaco.[150] Aun así, el perito se sostuvo en su conclusión de inimputabilidad, ya que el apelante era una persona con trastorno bipolar, que se había hospitalizado unos meses antes; ocasión en que presentó irritabilidad, tensión, insomnio, pesadillas y agresividad verbal, lo que relacionó con que estaba entrando en

---

[144] TPO pág. 250 líneas 7-10.
[145] TPO págs. 253 líneas 27-30; 277 líneas 23-29.
[146] TPO págs. 251 líneas 13-30; 252 líneas 1-9; 282 líneas 9-30.
[147] TPO pág. 252 líneas 17-28.
[148] TPO pág. 254 líneas 26-30.
[149] TPO págs. 273 líneas 25-30; 274 líneas 1-4.
[150] TPO pág. 275 líneas 19-22.

un estado maniaco.[151] Indicó que el tratamiento de este padecimiento era a base de medicamentos;[152] y el apelante llevaba entre cinco (5) a seis (6) días sin medicación, lo que podía causar un estado psicótico severo.[153]

A preguntas del Ministerio Público, acerca de los hechos de este caso en específico, el doctor Lladó Díaz atestiguó que **lo único que el apelante le dijo fue que ese día estaba mal, que le disparó a su hijo y que el diablo es puerco**.[154] Fue a base de esas expresiones que el perito concluyó sobre la inimputabilidad del apelante.[155] En el turno de contrainterrogatorio, se expresó:

> P. En relación a ese día de los hechos lo único que usted evaluó fue según surge de este informe del día de los hechos y la declaración jurada del Agente Kelvin Morales, las denuncias y esta entrevista con Hiram, correcto.
>
> R. Sí.
>
> P. Para evaluar el día de los hechos.
>
> R. Sí.
>
> P. Por lo que habiendo evaluado esas 3 esos 3 documentos para basar su informe pericial, de este informe, no surge que ese día, Hiram escuchaba voces eso no surge de ese informe.
>
> R. No.
>
> **P. No escuchaba voces.**
>
> **R. No.**
>
> P. Tampoco surge, recuerda con un sí o con un no. No surge. De su informe **tampoco surge que Hiram, le había dicho que él veía cosas, tampoco veía cosas, no veía demonios, no veía nada**. Eso no surge de ese informe, porque no surgió de la entrevista, ni surgió de la declaración jurada que usted evaluó.
>
> **R. Eso en específico, no.**
>
> P. Eso en específico de las 5 páginas no dice que él veía cosas. **No dice que veía sombras, ni demonio, ni veía cosas, donde no las había, eso no lo dice.**
>
> R. Precisamente de esa.
>
> P. Sí o no. No, no, no, [doctor], le voy a pedir de favor si lo dice en el informe o no lo dice, que fue lo que usted preparó luego de entrevistar a Hiram, sobre los hechos de este día.

---

[151] TPO págs. 279 líneas 18-30; 280 líneas 1-6; 281 líneas 6-10.
[152] TPO pág. 250 líneas 18-22.
[153] TPO pág. 282 líneas 3-8.
[154] TPO pág. 257 líneas 1-4 y 18-19.
[155] TPO págs. 267 líneas 26-29; 268 líneas 1-5.

**R. No, lo dice.**[156] (Énfasis nuestro).

El perito opinó que el uso de sustancias puede agravar o exacerbar un episodio maniaco.[157] Empero, apuntó que, entre 2016 a 2021, el apelante **no presentó alucinaciones, ideas suicidas, homicidas ni episodios de manía**.[158] Por el contrario, **de unas notas de progreso en el expediente de Inspira surgía que el apelante tenía un juicio adecuado y estaba orientado en cuanto a tiempo y espacio**.[159]

### *Dr. Raúl López Menéndez*

Al perito de refutación, especializado en psiquiatría y subespecializado en psiquiatría forense, le precede una práctica de 30 años.[160] Para su declaración tomó en consideración el informe y el testimonio del doctor Lladó Díaz, declaraciones juradas prestadas en el caso, expedientes médicos del tratamiento ambulatorio y hospitalario del apelante, incluyendo el del Departamento de Corrección y Rehabilitación.[161] Al respecto, discrepó de la opinión del doctor Lladó Díaz, toda vez que el apelante no cumplía con los criterios de inimputabilidad.[162] Mencionó la subjetividad del fenómeno de ganancia secundaria, que consiste en la exageración o fabricación de los síntomas de una enfermedad con el propósito de no ser encarcelado.[163]

Sobre el padecimiento de bipolaridad, entre otras cosas, esbozó que "cuando la persona entra en un estado de manía pierde total control de sí mismo. En la literatura hay casos de personas que han cometido actos violentos, en episodios de manía, pero la gran mayoría de estas personas, están tan y tan descompensadas que no

---

[156] TPO pág. 258 líneas 4-28
[157] TPO pág. 328 líneas 16-20.
[158] TPO págs. 265 líneas 13-19; 266 líneas 1-5.
[159] TPO pág. 266 líneas 6-17.
[160] TPO págs. 285 líneas 26-30; 286 líneas 1-2.
[161] TPO págs. 290 líneas 26-30; 291 líneas 1-5.
[162] TPO pág. 291 líneas 6-10.
[163] TPO pág. 291 líneas 21-30.

pueden ni siquiera formar una intención; si agreden a alguien lo hacen de una manera descontrolada, no enfocada [...]".[164] Es decir, la psicosis es un síndrome cerebral en que la persona afectada pierde contacto con la realidad.[165] Los actos ilegales son producto de la influencia de delirios, alucinaciones e impulsividad psicótica.[166] Esto se presenta en pacientes con esquizofrenia, entre otras circunstancias.[167] En el caso del trastorno bipolar, si bien en algunos casos puede ser una condición incapacitante, la psicosis no ocurre con tanta frecuencia.[168]

Por otro lado, **describió el coraje como una emoción autoalimentada**, que **no cumple con los criterios de inimputabilidad porque no es una enfermedad ni un defecto mental**, sino un estado emotivo, que puede producir una impulsividad severa. Pero **la persona bajo coraje es imputable ya que lo puede controlar**.[169] Aseveró:

> En este caso, pues básicamente, cuando oigo todo el testimonio del Dr. Lladó y veo el historial, en el historial pasado y revisé ese expediente nota a nota, no hay un solo dato objetivo que indique que este señor ha tenido ni siquiera un episodio de hipomanía. En el pasado, **casi todas las veces que estaba hospitalizado ha sido por conducta agresiva** y los médicos que lo han visto inclusive se puede ver de algunas de las, de los diagnósticos le ponen trastorno bipolar no específico, que es parece pero no tengo la evidencia, **trastorno bipolar atípico, que significa que no conforma con las reglas del trastorno bipolar** como deben de ser y si observo, que es una cosa contradictoria, que **todos los exámenes mentales, parecen normal, no psicótico en contacto con la realidad**.[170] (Énfasis nuestro).

En el caso del apelante, el doctor López Menéndez rechazó que hubiera tenido un episodio maniaco, pues transcurridos los hechos estaba tranquilo, se sentía bien y comprendía la situación. "[E]so es bien poco posible de una persona que el día anterior tuvo un

---

[164] TPO pág. 293 líneas 20-25.
[165] TPO pág. 294 líneas 9-13.
[166] TPO pág. 294 líneas 13-16.
[167] TPO pág. 294 línea 17.
[168] TPO pág. 324 líneas 14-27.
[169] TPO págs. 294 líneas 22-29; 295 líneas 1-5.
[170] TPO pág. 295 líneas 5-15.

**episodio de manía** [...] **[n]o empieza de súbito y acaba de súbito**".[171] (Énfasis nuestro). Fuera de la ansiedad por las preocupaciones del diario vivir e insomnio, no refirió otra sintomatología del apelante, por lo que concluyó que no existían datos objetivos que apoyaran las impresiones del doctor Lladó Díaz, sobre que al momento de los hechos el señor Morales Negrón se encontraba en un estado maniaco.[172] El experto reconoció la afectación emocional causada por la muerte de dos (2) de los hijos del apelante[173] y **no descartó que el apelante padeciera alguna condición mental**, de conformidad con los diagnósticos de sus expedientes médicos,[174] pero esto, por sí solo, **no lo hacía automáticamente inimputable**.[175] Para el **20 de abril de 2021**, cuando fue admitido en el Hospital Panamericano, el apelante, quien tomaba medicamentos relacionados con la salud mental, **tuvo un estresor por una disputa con un hijo**. En esa ocasión, mostró agresividad, agitación psicomotora, estado de ánimo expansivo, euforia e irritabilidad.[176] El diagnóstico fue de desorden bipolar episodio mixto.[177] Ahora, según la opinión del perito López Menéndez, cuatro (4) meses después, el día de los hechos el 12 de agosto de 2021, el apelante tenía coraje por la Orden de Protección *Ex parte* interpuesta en su contra, unido a la posibilidad de que le quitaran su casa.[178] Expuso:

> **Cuando ocurre el evento, me llama la atención el que él discrimine**, entre uno de sus hijos y con el otro **hijo que fue el que murió y con su esposa** que es con quien aparentemente, lo que hemos discutido él **tenía cierta pendencia** por el mismo [*sic*] situación de esta, de la **orden de protección**, es a los que él le dispara. Luego de esto llega la policía y ocurre otra cosa que también me llama la atención y es que, como les mencioné, **una persona que esté en un estado de**

---

[171] TPO pág. 296 líneas 5-13.
[172] TPO pág. 296 líneas 20-25.
[173] TPO pág. 301 líneas 7-15.
[174] TPO pág. 300 líneas 19-30.
[175] TPO pág. 325 líneas 28-30.
[176] TPO págs. 299 líneas 6-22; 312 líneas 8-9.
[177] TPO pág. 300 líneas 24-28.
[178] TPO pág. 296 líneas 26-30.

**manía no discrimina entre la esposa y la policía**, él le puede mandar la guardia nacional, que se faja con la guardia nacional, porque su cerebro no está pensando, está demasiado acelerado, para pensar y lo que sucede es que **él reconoce la presencia de la policía, tira el arma, para asegurarse de que no hay ninguna razón para que la policía le riposte y lo mate, *so*, requiere que hay cierto grado de pensamiento lógico** y no hay ninguna información de parte de los, de la policía de que él estuviere tratando de arrancarle las puertas a la patrulla, que estaba diciendo disparates, que estaba diciendo que él era el enviado del señor y que esto iban a pagarlo todos, que son por decirle un ejemplo comentarios que un paciente que está en un estado de manía, dice. Después de esto, en la hospitalización, pues **no hay ninguna otra evidencia que nos indique que existía un estado maniaco** y lo que me lleva a mí a la conclusión de que **esto fue probablemente causado por un episodio de coraje, que tiene que ver mucho con la personalidad de esta persona, las experiencias que ha tenido a lo largo de su vida** y no descarto que pudiese sufrir de trastorno bipolar, pero por lo menos la evidencia clínica que hay en los expedientes no lo apoya.[179] (Énfasis nuestro).

Esto es, en el estado maniaco, la persona no discrimina y pierde la capacidad de razonar. Según el perito, **el apelante sí discriminó**.[180] Para el perito, a base de las declaraciones juradas de los testigos, el apelante no presentó los elementos del DSM-5.[181] Por lo tanto, el doctor López Menéndez concluyó que el apelante no logró rebatir la presunción de cordura.[182]

**IV.**

En los **errores primero y segundo**, el señor Morales Negrón aduce que el TPI incidió al declararlo culpable, ya que sostiene que la prueba de cargo no estableció, más allá de duda razonable, su imputabilidad al momento de los hechos; aun cuando dice que rebatió la presunción de cordura, lo que transgredió sus derechos constitucionales. Arguye que el TPI incurrió en prejuicio, desinterés y parcialidad hacia la prueba de inimputabilidad. Alega también que

---

[179] TPO pág. 297 líneas 1-23.
[180] TPO págs. 319 líneas 7-8; 321 líneas 3-6; 323 líneas 27-30; 323 líneas 1-8; 325 líneas 10-12.
[181] TPO págs. 317-318; 323 líneas 20-28. El DSM son las siglas en inglés de "diagnostic and statistical manual", un instrumento formulado por la Asociación Americana de Psiquiatría, el cual sirve de guía de referencia para poder facilitar los diagnósticos de forma más clara y precisa. Véase, TPO pág. 244 líneas 12-14.
[182] TPO pág. 298 líneas 1-3.

no se demostraron las tentativas de asesinato contra Xavier Armando y doña Juanita.

Por su relación intrínseca, al igual que el apelante, discutimos en conjunto ambos señalamientos.

Como cuestión de umbral, debemos recalcar que la defensa de incapacidad mental presupone el reconocimiento de la comisión de los hechos delictivos por parte del apelante, pero en un supuesto estado de inimputabilidad. En la causa presente, sin embargo, una vez evaluada la evidencia documental, testifical y pericial, nos resulta patente que el apelante era imputable al momento de los hechos y la prueba desfilada por el Ministerio Público fue suficiente en Derecho para demostrar, más allá de duda razonable, cada uno de los elementos de los delitos imputados y que el apelante fue quien los cometió. Opinamos que el señor Morales Negrón no rebatió la presunción de cordura ni demostró su inimputabilidad ese 12 de agosto de 2021, en horas de la tarde. De igual modo, contrario a lo alegado por el señor Morales Negrón, éste no derrotó la corrección que cobija la decisión del TPI; ni identificamos un ápice de pasión, prejuicio, parcialidad o error manifiesto, en su apreciación de la prueba, de modo que se impone la confirmación de todos los dictámenes apelados. Veamos.

La Defensa presentó el testimonio del perito Lladó Díaz, para intentar demostrar la defensa de inimputabilidad por incapacidad mental. Es decir, que, el 12 de agosto de 2021 en horas de la tarde, el apelante no tenía control de sus actos ni entendía sus consecuencias. El conciso informe sobre el que testificó el galeno se asentó en una breve entrevista con el apelante meses después de los hechos, en el que éste reconoció haber disparado contra su hijo Denny Amílcar Morales Torres y se limitó a expresar que *ese día estaba mal*, y que *el diablo es puerco*. El doctor Lladó Díaz evaluó varios expedientes médico-psiquiátricos del apelante, así como los

documentos de la Administración del Seguro Social. No obstante, llama la atención que no se hizo referencia a la Orden de Protección *Ex parte* expedida apenas dos (2) días antes de los hechos ni se consideraron los testimonios de las víctimas y testigos que prestaron declaraciones juradas sobre el fatídico día en que el apelante asesinó a su hijo y atentó contra la vida de su esposa, suegra e hijo menor.

Las carencias de datos esenciales y análisis imparcial, entre otras cosas, resultan en expresiones, como mínimo, cuestionables. A modo de ejemplo, primero afirmar que el apelante perdió la capacidad de razonar, no estaba en contacto con la realidad, no podía aquilatar las consecuencias de sus actos y estaba enfocado en un objetivo hasta llevarlo a cabo. Y luego —aun cuando el objetivo de matar a la señora Torres Maldonado no se materializó—justificar que instantáneamente el apelante podía seguir las instrucciones de la Policía y autoprotegerse. Recuérdese que, ante el alto del agente Morales Negrón, el apelante tranquilamente arrojó el arma y decidió entregarse y no atacar al oficial del orden público porque supuestamente lo conocía. Distinto hubiera sido que el "Teniente" o el "Sargento" hubieran intervenido nuevamente con él, porque a éstos, según los dichos del apelante, sí les hubiera disparado. El doctor López Menéndez atestiguó que las personas bajo un episodio maniaco no discriminaban, tal como el apelante evidentemente hizo. Tampoco nos persuade que las crisis maniacas comiencen y terminen de forma súbita, como sugirió el doctor Lladó Díaz. Es notable que en los expedientes médicos consta que la última hospitalización del apelante se remontó a abril de 2021, ocasión en que presentó agresividad, agitación, euforia e irritabilidad, pero no episodios psicóticos. De hecho, de los documentos surge que, en al menos cinco (5) años de tratamiento, el apelante nunca experimentó alucinaciones, delirios, ni historial de daño autoinfligido ni ideas suicidas u homicidas. Por el contrario, se consignó que tenía un

juicio adecuado y estaba orientado en cuanto a tiempo y espacio. Incluso, iniciada la acción penal, el apelante fue encontrado procesable en dos (2) ocasiones. Decididamente, la suma de estos factores incide de manera adversa sobre la confiabilidad de las conclusiones periciales del doctor Lladó Díaz, al ser insuficientes para rebatir la presunción de cordura e imputabilidad que permea en nuestro ordenamiento.

De otro lado, el doctor López Menéndez atribuyó los crímenes a un episodio de coraje, en una persona ya agresiva e irritable. Afirmó que esta emoción no correspondía a una enfermedad mental y podía controlarse, por lo que la persona que delinque por impulsos de coraje es imputable. Destacó el hecho que apenas dos (2) días antes se expidiera la Orden de Protección *Ex parte* y que el apelante se ensañara particularmente con la víctima mortal y la señora Torres Maldonado, con quienes tenía pendencia.

Ciertamente, el TPI contó con la prueba pericial que lo puso en condiciones para determinar el estado mental del apelante al momento de los hechos, y dirimió la credibilidad que le merecieron los peritos presentados por las partes para dicho propósito. El juzgador de hechos no está obligado a aceptar las conclusiones de un perito. *Pueblo v. Montes Vega*, 118 DPR 164, 170-171 (1986). A nuestro juicio, sí se probó que el señor Morales Negrón padece algún tipo de trastorno bipolar y es una persona agresiva. Sin embargo, para la apreciación del estado de inimputabilidad, se requiere una carencia de capacidad mental suficiente o sustancial. *Pueblo v. Cotto García, supra,* 251, que cita a *Pueblo v. Marcano Pérez,* 116 DPR 917, 926-927 (1986). En el caso que evaluamos, no apreciamos base alguna para interpretar que el apelante estaba actuando bajo psicosis y que desconocía que estaba delinquiendo. El simple hecho de tener un historial psiquiátrico previo, no necesariamente lo convierte en inimputable. Esto es, el padecimiento de un desorden

de bipolaridad no equivale a que el apelante no comprendía la criminalidad de sus actos. Huelga mencionar que ni siquiera la incapacidad decretada por la Administración de Seguro Social puede relacionarse con los hechos delictivos, ya que ese trámite sólo va dirigido a determinar la funcionalidad o no de una persona para trabajar. La inimputabilidad y la incapacidad laboral son cosas muy distintas.

De la prueba presentada surge indubitadamente que, luego de cuatro (4) meses de separación, el 10 de agosto de 2021, la señora Torres Maldonado solicitó y el TPI expidió la Orden de Protección *Ex parte* OPA-2021-015088 en contra del señor Morales Negrón.

> Alega la peticionaria que su pareja tiene un problema con el consumo excesivo de alcohol y drogas lo que lo pone muy agresivo. Éste se torna violento [y] la peticionaria teme por su seguridad en estos episodios violentos. La peticionaria indica que el peticionado es un paciente siquiátrico que además de consumir los medicamentos recetados hace uso de sustancias controladas lo que lo torna violento y hostil. La peticionada teme por su seguridad al punto que tuvo que abandonar su hogar.

Apenas dos (2) días después, el apelante violó el mandamiento judicial. Se dirigió a la casa familiar, sita en el Barrio Higüero en Villalba, en una *pick up* azul, propiedad de su hermano.[183] Portó y disparó un arma de fuego con un aditamento en el *fighter pin* para convertirla en automática, junto a tres (3) abastecedores con capacidad de 22, 15 y 9 municiones, lo que denota planificación, intención criminal y el objetivo consciente para cometer los delitos.

Al arribar, primero, disparó a su esposa que estaba en la marquesina, hiriéndola en un dedo de la mano izquierda. La señora Torres Maldonado tuvo la oportunidad de evadirlo y entrar a la casa. El apelante, entonces, disparó la puerta para ingresar a la morada.

Inicialmente, el apelante discriminó y le dijo a su hijo Xavier Armando que *si no te sales te tiro a ti también*. Sin embargo, luego el

---

[183] TPO pág. 215 líneas 29-30.

apelante rompió la ventana de la habitación —donde se resguardaron su hijo menor, esposa y suegra— y disparó contra su familia. *No los maté a todos porque se me trancó el arma—* expresó el apelante una vez fue arrestado.

Alertado del violento incidente, Denny Amílcar Morales Torres (q.e.p.d.) llegó al lugar para defender a su progenitora. *No le dispares a mami, dispárame a mí.* Con conocimiento y a propósito, el apelante tomó la decisión de asesinar a su hijo con un arma de fuego automática. Lo impactó en cuatro (4) ocasiones. Cuando yacía en el pavimento, el apelante le dijo a su hijo asesinado que si *¿eso no era lo que tú querías?*

Posteriormente, cuando intervino la Policía, el apelante volvió a discernir al decidir entregarse, específicamente, al agente Morales Negrón porque decía conocerlo. *Si llega ser el Teniente y el Sargento que vinieron aquí, les tiraba.* Tales actos y expresiones demuestran total conexión con la realidad al momento de los hechos. El apelante tenía pleno conocimiento de sus actos y suficiente control volitivo para escoger a quién disparaba y a quién no.

Finalmente, aun advertido de su derecho a guardar silencio, el apelante expresó los motivos de sus actos criminales; a saber: *me dejaste sin casa y sin familia*; *te maté a tu hijo para que sufras*; *me jodieron la vida*; *con embustes me quitaron todo.*

Una persona asesina a un ser humano a propósito o con conocimiento cuando el objetivo consciente es cometer el delito. De la prueba desfilada en el juicio se desprende que el señor Morales Negrón es una persona agresiva. Si bien fue diagnosticado con un trastorno bipolar, "todos los exámenes mentales, parecen normal, no psicótico en contacto con la realidad".[184] Indudablemente, la agresividad puede ser un síntoma del trastorno bipolar, pero ésta

---

[184] TPO pág. 295 líneas 14-15.

por sí sola no equivale a un estado psicótico. La psicosis implica una desconexión con la realidad, a menudo asociada con alucinaciones y delirios. Como enunciamos, durante la comisión de los hechos delictivos, esta desconexión de ninguna manera se probó. El apelante actuó como reacción a la Orden de Protección *Ex parte* y planificó atacar a su esposa y familia, lo que materializó dos (2) días después de expedido el mandamiento, ante la creencia de que lo había perdido todo por culpa de la señora Torres Maldonado. Estimamos que el apelante no logró demostrar la defensa de incapacidad mental al momento de la comisión de los delitos, que amerite su inimputabilidad. Así, pues, colegimos que no fue derrotada la presunción de cordura.

En fin, luego de un examen sosegado de toda la prueba, concluimos con certeza moral y firme convicción que el apelante era imputable al momento de cometer los hechos y que no erró el TPI al así determinarlo. No hallamos razón para intervenir con la valoración impartida por el TPI a la prueba desfilada. A pesar de que este foro intermedio se encuentra en igual posición para evaluar la prueba pericial, y puede adoptar un criterio propio, no encontramos base alguna para variar dicha determinación.

En el **señalamiento de error tercero**, al palio de la doctrina del concurso de disposiciones penales, estatuido en el Artículo 9 del Código Penal de 2012, 33 LPRA sec. 5009, el apelante alega que el TPI erró al condenarlo por varias infracciones al Artículo 6.14 de la Ley de Armas de 2020, al apuntar y disparar un arma de fuego, ya que, a su vez, fue condenado por la comisión de delitos de mayor alcance, con relación al asesinato y su tentativa.

El Artículo 9 del Código Penal de 2012, *supra, Concurso de disposiciones penales*, establece lo que sigue:

Cuando la misma materia se regula por diversas disposiciones penales:

(a) La disposición especial prevalece sobre la general.

(b) La disposición de mayor alcance de protección al bien jurídico absorberá la de menor amplitud, y se aplicará la primera.

(c) La subsidiaria aplicará sólo en defecto de la principal, si se declara expresamente dicha subsidiaridad, o ésta se infiere.

El inciso (a) formula el *principio de especialidad* que se aplica en los casos en que un mismo hecho se regula por una ley general y otra especial. En esas instancias, se aplica la ley especial. D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, Ed. Inst. para el Desarrollo del Derecho, 2019, pág. 19. En el inciso (b) se establece el *principio de consunción*, en que la disposición de mayor alcance al bien jurídico afectado absorbe a la disposición de menor amplitud, prevaleciendo la primera. *Id.,* pág. 20. El inciso (c) incorpora el *principio de subsidiaridad*. Este precepto dispone que la ley subsidiaria aplicará en lugar de la principal cuando así conste expresamente o cuando se infiera. Es decir, en la subsidiaridad expresa, la propia norma dispone que su aplicación depende de que no sea de aplicación otra norma; en la tácita, será necesario comparar ambas leyes y seleccionar la norma que mejor describa el hecho delictivo. *Id.,* págs. 20-21.

Según esbozamos, el delito de asesinato se comete cuando se da muerte a un ser humano a propósito, con conocimiento o temerariamente. El bien jurídico protegido es la vida humana y sus elementos consisten en que el acusado asesinó a otra persona a propósito o con conocimiento. Cuando el delito no se consume por circunstancias ajenas a la voluntad del perpetrador, se constituye la tentativa de asesinato.

El Artículo 6.14 de la Ley de Armas de 2020 criminaliza el acto de apuntar o disparar un arma de fuego hacia una persona, fuera de los lugares autorizados y aunque no se cause daño. En aras de tutelar la seguridad pública, se penaliza severamente el mal uso de

un arma de fuego, precisamente por su peligrosidad y su característica de instrumento mortífero. Por igual, el Artículo 6.01 del aludido estatuto impone que todas las penas de reclusión que se impongan bajo éste serán cumplidas consecutivamente entre sí y con las impuestas bajo cualquier otra ley. Véase, *Pueblo v. Bonilla Peña*, 183 DPR 335, 352 (2011).

Un análisis integral de las disposiciones citadas nos fuerza a colegir que, en vista de que el preeminente Artículo 6.01 de la ley especial dispone que las penas deben cumplirse consecutivamente, entonces, se descarta la aplicabilidad de la figura del concurso de delitos estatuido en la ley general. Sobre este particular, en referencia al predecesor del Artículo 6.01 de la Ley de Armas de 2020 —el antiguo Artículo 7.03 de la hoy derogada Ley de Armas de 2000— la profesora Nevares Muñiz comentó que, por legislación, se dispone que no aplica el concurso de delitos. D. Nevares Muñiz, *Derecho Penal Puertorriqueño*, *op. cit.*, págs. 348. Por ello, la pena que corresponda bajo el Código Penal y la pena por la Ley de Armas se cumplirán de forma consecutiva.

En fin, los delitos de asesinato y su tentativa comprenden elementos distintos a las infracciones de armas aquí imputadas. Entre éstos no opera la consunción ni la subsidiariedad. Ello así, ya que no regulan la misma conducta ni protegen el mismo bien jurídico. Igualmente, por virtud del Artículo 6.01 de la Ley de Armas de 2020 y la voluntad legislativa no aplica la figura de concurso por los delitos de asesinato y su tentativa estatuidos en el Código Penal de 2012, con las infracciones a la Ley de Armas de 2020 por apuntar y disparar un arma de fuego. No existe un conflicto de leyes ni se regula la misma materia. Al ejercer su discreción y facultad, la Asamblea Legislativa dispuso la inaplicabilidad del concurso de delitos en estos crímenes e impuso el castigo independiente y consecutivo de los delitos de asesinato, su tentativa, apuntar y

disparar un arma de fuego, aun cuando se cometan en un único acto. El error no se cometió.

Por último, en el **cuarto señalamiento de error** el señor Morales Negrón arguye que el TPI se equivocó al duplicar las penas de los delitos imputados de los Artículos 6.14 y 6.22 de la Ley de Armas de 2020, por virtud del Artículo 6.01 del estatuto, aun cuando las acusaciones no incluyeron circunstancias agravantes.

De entrada, debemos apuntar que cualquier hecho, salvo una condena previa, que aumente la pena máxima por un delito debe imputarse en el pliego de acusación, someterse al juzgador de hechos (jurado o tribunal) y probarse más allá de toda duda razonable. Véase, *Apprendi v. New Jersey*, 530 U.S. 476 (2000). Por imperativo del debido proceso de ley, en su vertiente procesal, "[e]n todos los procesos criminales, el acusado disfrutará del derecho ... a ser notificado de la naturaleza y causa de la acusación recibiendo copia de la misma...". Art. II, Sec. 11 Const. P.R., LPRA, Tomo 1. Mediante la acusación o la denuncia, el Ministerio Público cumple con su deber de informar al imputado la naturaleza y la extensión del delito por el cual se le acusa. *Pueblo v. Pagán Rojas*, 187 DPR 465, 480 (2012); *Pueblo v. Montero Luciano*, 169 DPR 360, 387-388 (2006). Claro está, la responsabilidad criminal del acusado y la adjudicación de la pena le corresponde al juez. *Pueblo v. Santana Vélez*, 177 DPR 61, 66 (2009).

Como reseñamos, en *Pueblo v. Bonilla Peña, supra*, pág. 352, el Tribunal Supremo expresó que, "[l]as penas carcelarias dispuestas en la Ley de Armas se impondrán de forma consecutiva a cualquier otra sentencia". En referencia a la duplicación de las penas del estatuto especial, en *Pueblo v. Concepción Guerra, supra*, págs. 313-314, el alto foro añadió que *"la pena que dicho precepto autoriza duplicar es la pena dispuesta para el delito imputado una vez considerados los posibles agravantes y atenuantes. Ahora bien,*

*en ausencia de estos agravantes o atenuantes la duplicación se rige por la pena fija establecida*". (Bastardillas en el original y subrayado nuestro).

En el presente caso, el apelante resultó convicto por múltiples violaciones al Artículo 6.14 de la Ley de Armas de 2020: **JLA2021G0187** ("APUNTÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU HIJO XAVIER ARMANDO MORALES TORRES"); **JLA2021G0188** ("DISPARÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU HIJO XAVIER ARMANDO MORALES TORRES"); **JLA2021G0189** ("DISPARÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU ESPOSA NÉLIDA TORRES MALDONADO"); **JLA2021G0190** ("DISPARÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU HIJO DENNY AMÍLCAR MORALES TORRES"); **JLA2021G0193** ("DISPARÓ UN ARMA DE FUEGO COLOR NEGRA HACIA SU SUEGRA JUANITA MALDONADO SANTIAGO").[185] En todos esos delitos, el apelante infringió la disposición al apuntar y disparar un arma de fuego contra su esposa, suegra e hijos, sin que mediaran funciones oficiales o deportivas ni legítima defensa. La pena fija es de cinco (5) años. El Artículo 6.14 de la Ley de Armas de 2020 dispone que, de mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años.

Además, al señor Morales Negrón se le imputó la violación del Artículo 6.22 de la Ley de Armas de 2020, en el cargo **JLA2021G0192** ("POSEYÓ MUNICIONES CALIBRE 40 DE ARMAS DE FUEGO SIN TENER NINGUNA LICENCIA AUTORIZADA POR LEY").[186] El apelante infringió la disposición al poseer las

---

[185] Obsérvese que el inciso (r) del Artículo 66 del Código Penal de 2012, 33 LPRA sec. 5099, contempla como agravante la existencia de un vínculo de parentesco del convicto con la víctima del delito dentro del segundo grado de consanguinidad, afinidad o por adopción.

[186] Los incisos (a) y (d) de la Regla 171 de Procedimiento Criminal, 34 LPRA Ap. II, disponen, en parte, que se podrán considerar como circunstancias agravantes cuando "[e]l delito fue de violencia, se causó grave daño corporal, o amenaza de

municiones en tres (3) abastecedores, sin tener una licencia de armas vigente, ni de armero ni ser un agente del orden público. La pena fija es de seis (6) años. En el Artículo 6.22 de la Ley de Armas de 2020, se establece que, de mediar circunstancias agravantes, la pena fija podrá ser aumentada hasta un máximo de doce (12) años.

Como vemos, ambas disposiciones estatutarias, con penas fijas establecidas de cinco (5) y seis (6) años, pueden aumentarse con la existencia de agravantes. Ahora bien, de conformidad con el Artículo 6.01 de la Ley de Armas de 2020, se provee para la duplicidad de las penas cuando la persona convicta "usare un arma en la comisión de cualquier delito y como resultado de tal violación, alguna persona sufriera daño físico o mental".

En este caso, ni el Ministerio Público imputó agravantes en las acusaciones ni el TPI aumentó las penas por dicha causa. El sentenciador duplicó las penas fijas establecidas de cinco (5) y seis (6) años, a diez (10) y doce (12), respectivamente, al considerar las circunstancias estatuidas en el Artículo 6.01 de la Ley de Armas de 2020, las cuales no tienen que alegarse en el pliego acusatorio ni requieren vista, pues operan por virtud del estatuto especial. Es decir, por disposición legislativa, el referido articulado limita la discreción del TPI y le impone duplicar las penas cuando, como resultado de las violaciones a la Ley de Armas de 2020, se demuestra la existencia de daños físicos o mentales a terceros. Ello responde a un interés apremiante del Estado de crear un disuasivo efectivo con serias consecuencias para el delincuente que incurre en actos delictivos mediante el uso de armas de fuego y municiones, ambos objetos mortíferos, provocando daños físicos y mentales a terceros. Nótese que, en un juicio criminal por Tribunal de Derecho como el

---

causarlo y se evidenciaron hechos que revelan una gran crueldad, ningún respeto humano y un rechazo a las normas de la decencia"; así como cuando "[e]l delito envolvió más de una víctima".

que nos ocupa, al aplicar el referido mandato legislativo de duplicación de penas, el juzgador toma en consideración los hechos que el Ministerio Público probó más allá de duda razonable.

El TPI no tenía discreción para ignorar la clara directriz estatutaria de la Asamblea Legislativa establecida en el Artículo 6.01 de la Ley de Armas de 2020. El sentenciador estaba compelido a duplicar las penas fijas impuestas por las infracciones a los Artículos 6.14 y 6.22 de dicho ordenamiento, una vez se demostraron los daños contra la esposa, suegra e hijos del apelante, causados al apuntar, disparar y poseer municiones letales calibre .40 de armas de fuego. En conclusión, se sostienen las penas duplicadas por ser conformes al ordenamiento legal, al Tribunal de Derecho justipreciar y aplicar el estatuto especial, de conformidad con los hechos criminales probados.

**V.**

Por los fundamentos antes expuestos, los cuales hacemos formar parte de este dictamen, se confirman todas las *Sentencias Enmendadas* apeladas.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones